## NEW YORK ET AL. *v.* FEDERAL ENERGY REGULATORY COMMISSION ET AL.

No. 00–568.   Argued October 3, 2001—Decided March 4, 2002*

---

*Together with No. 00–809, *Enron Power Marketing, Inc.* v. *Federal Energy Regulatory Commission et al.*, also on certiorari to the same court.

1

*Lawrence G. Malone* argued the cause and filed briefs for petitioners State of New York et al. in No. 00–568 and a brief for respondents State Public Service Commissions in No. 00–809. With him on the briefs were *Jonathan D. Feinberg* and *Carl F. Patka.*

*Louis R. Cohen* argued the cause and filed briefs for petitioner in No. 00–809 and a brief for respondent Enron Power Marketing, Inc., in No. 00–568. With him on the briefs were *Joseph E. Killory, Jr., Jonathan J. Frankel, I. Jay Palansky, Jeffrey D. Watkiss,* and *Joseph R. Hartsoe.* Briefs for re-

4

spondents under this Court's Rule 12.6 in support of petitioner in No. 00–809 were filed by *James van R. Springer* and *Steven L. Miller* for the Electric Power Supply Association; and by *Sara D. Schotland* for the Electricity Consumers Resource Council et al. Briefs for respondents under this Court's Rule 12.6 in support of petitioners in No. 00–568 were filed by *Robert C. McDiarmid, Cynthia S. Bogorad,* and *Peter J. Hopkins* for the Transmission Access Policy Study Group; and by *Michael A. Mullett* for Citizens Action Coalition of Indiana, Inc.

*Deputy Solicitor General Kneedler* argued the cause for respondents in both cases. With him on the brief for respondent Federal Energy Regulatory Commission were *Acting Solicitor General Underwood, Austin C. Schlick, Cynthia A. Marlette,* and *Timm L. Abendroth. Charles G. Cole, Alice E. Loughran, Edward H. Comer,* and *Barbara A. Hindin* filed a brief for the Edison Electric Institute, respondent in both cases.†

JUSTICE STEVENS delivered the opinion of the Court.

These cases raise two important questions concerning the jurisdiction of the Federal Energy Regulatory Commission (FERC or Commission) over the transmission of electricity. First, if a public utility "unbundles"—*i. e.,* separates—the cost of transmission from the cost of electrical energy when billing its retail customers, may FERC require the utility to transmit competitors' electricity over its lines on the same terms that the utility applies to its own energy transmis-

---

†*Bohdan R. Pankiw* and *John A. Levin* filed a brief for the Pennsylvania Public Utility Commission as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the State of California et al. by *Bill Lockyer,* Attorney General, *Peter Siggins,* Chief Deputy Attorney General, *Rick Frank,* Chief Assistant Attorney General, *Morris Beatus,* Senior Assistant Attorney General, *Gary M. Cohen,* and *William Julian II;* and for Electrical Engineers et al. by *Charles J. Cooper.*

sions? Second, must FERC impose that requirement on utilities that continue to offer only "bundled" retail sales?

In Order No. 888, issued in 1996 with the stated purpose of "Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities,"[1] FERC answered yes to the first question and no to the second. It based its answers on provisions of the Federal Power Act (FPA), as added by §213, 49 Stat. 847, and as amended, 16 U. S. C. §824 *et seq.*, enacted in 1935. Whether or not the 1935 Congress foresaw the dramatic changes in the power industry that have occurred in recent decades, we are persuaded, as was the Court of Appeals, that FERC properly construed its statutory authority.

## I

In 1935, when the FPA became law, most electricity was sold by vertically integrated utilities that had constructed their own power plants, transmission lines, and local delivery systems. Although there were some interconnections among utilities, most operated as separate, local monopolies subject to state or local regulation. Their sales were "bundled," meaning that consumers paid a single charge that included both the cost of the electric energy and the cost of its delivery. Competition among utilities was not prevalent.

Prior to 1935, the States possessed broad authority to regulate public utilities, but this power was limited by our cases holding that the negative impact of the Commerce Clause prohibits state regulation that directly burdens interstate commerce.[2] When confronted with an attempt by Rhode Is-

---

[1] FERC Stats. & Regs., Regs. Preambles, Jan. 1991–June 1996, ¶ 31,036, p. 31,632, 61 Fed. Reg. 21540 (1996). Order No. 888 also deals with the recovery of "stranded costs" by utilities, but this aspect of the order is not before us.

[2] For example, in cases involving the interstate transmission of natural gas, we held that a State could regulate direct sales to consumers even when the gas was drawn from interstate mains, *Pennsylvania Gas Co.* v. *Public Serv. Comm'n of N. Y.*, 252 U. S. 23 (1920); *Public Util. Comm'n of*

land to regulate the rates charged by a Rhode Island plant selling electricity to a Massachusetts company, which resold the electricity to the city of Attleboro, Massachusetts, we invalidated the regulation because it imposed a "direct burden upon interstate commerce." *Public Util. Comm'n of R. I.* v. *Attleboro Steam & Elec. Co.,* 273 U. S. 83, 89 (1927). Creating what has become known as the *"Attleboro* gap," we held that this interstate transaction was not subject to regulation by either Rhode Island or Massachusetts, but only "by the exercise of the power vested in Congress." *Id.,* at 90.

When it enacted the FPA in 1935,[3] Congress authorized federal regulation of electricity in areas beyond the reach of state power, such as the gap identified in *Attleboro,* but it also extended federal coverage to some areas that previously had been state regulated, see, *e. g., id.,* at 87–88 (explaining, prior to the FPA's enactment, that state regulations affecting interstate utility transactions were permissible if they did not directly burden interstate commerce). The FPA charged the Federal Power Commission (FPC), the predecessor of FERC, "to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *Gulf States Util. Co.* v. *FPC,* 411 U. S. 747, 758 (1973). Specifically, in § 201(b) of the FPA, Congress recognized the FPC's jurisdiction as including "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in inter-

---

*Kan.* v. *Landon,* 249 U. S. 236 (1919), but that a State could not regulate the rate at which gas from out-of-state producers was sold to independent distributing companies for resale to local consumers, *Missouri ex rel. Barrett* v. *Kansas Natural Gas Co.,* 265 U. S. 298, 309 (1924).

[3] The FPA was enacted as Title II of the Public Utility Act of 1935, 49 Stat. 847. Title I of the Public Utility Act—not at issue here—regulated financial practices of interstate holding companies that controlled a large number of public utilities.

state commerce." 16 U. S. C. § 824(b). Furthermore, § 205 of the FPA prohibited, among other things, unreasonable rates and undue discrimination "with respect to any transmission or sale subject to the jurisdiction of the Commission," 16 U. S. C. §§ 824d(a)–(b), and § 206 gave the FPC the power to correct such unlawful practices, 16 U. S. C. § 824e(a).

Since 1935, and especially beginning in the 1970's and 1980's, the number of electricity suppliers has increased dramatically. Technological advances have made it possible to generate electricity efficiently in different ways and in smaller plants.[4] In addition, unlike the local power networks of the past, electricity is now delivered over three major networks, or "grids," in the continental United States. Two of these grids—the "Eastern Interconnect" and the "Western Interconnect"—are connected to each other. It is only in Hawaii and Alaska and on the "Texas Interconnect"— which covers most of that State—that electricity is distributed entirely within a single State. In the rest of the country, any electricity that enters the grid immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce.[5] As a result, it is now possible for

---

[4] In Order No. 888, FERC noted that the optimum size of electric generation plants has shifted from the larger, 500 megawatt plants (with 10-year lead time) of the past to the smaller, 50-to-150 megawatt plants (with 1-year lead time) of the present. These smaller plants can produce energy at a cost of 3-to-5 cents per kilowatt-hour, as opposed to the older plants' production cost of 4-to-15 cents per kilowatt-hour. Order No. 888, at 31,641.

[5] See Brief for Respondent FERC 4–5. Over the years, FERC has described the interconnected grids in a number of proceedings. For example, in 1967, the FPC considered whether Florida Power & Light Co. (FPL)—a utility attached to what was then the regional grid for the southeastern United States—transmitted energy in interstate commerce as a result of that attachment. The FPC concluded that FPL's transmissions were in interstate commerce: "[S]ince electric energy can be delivered virtually instantaneously when needed on a system at a speed of 186,000

power companies to transmit electric energy over long distances at a low cost. As FERC has explained, "the nature and magnitude of coordination transactions" have enabled utilities to operate more efficiently by transferring substantial amounts of electricity not only from plant to plant in one area, but also from region to region, as market conditions fluctuate. Order No. 888, at 31,641.

Despite these advances in technology that have increased the number of electricity providers and have made it possible for a "customer in Vermont [to] purchase electricity from an environmentally friendly power producer in California or a cogeneration facility in Oklahoma," *Transmission Access Policy Study Group* v. *FERC*, 225 F. 3d 667, 681 (CADC 2000) (case below), public utilities retain ownership of the transmission lines that must be used by their competitors to deliver electric energy to wholesale and retail customers. The utilities' control of transmission facilities gives them the power either to refuse to deliver energy produced by competitors or to deliver competitors' power on terms and condi-

---

miles per second, such energy can be and is transmitted to FPL when needed from out-of-state generators, and in turn can be and is transmitted from FPL to help meet out-of-state demands; . . . there is a cause and effect relationship in electric energy occurring throughout every generator and point on the FPL, Corp, Georgia, and Southern systems which constitutes interstate transmission of electric energy by, to, and from FPL." *In re Florida Power & Light Co.*, 37 F. P. C. 544, 549 (1967). This Court found the FPC's findings sufficient to establish the FPC's jurisdiction. *FPC* v. *Florida Power & Light Co.*, 404 U. S. 453, 469 (1972).

As *amici* explain in less technical terms, "[e]nergy flowing onto a power network or grid *energizes the entire grid,* and consumers then draw undifferentiated energy from that grid." Brief for Electrical Engineers et al. as *Amici Curiae* 2. As a result, explain *amici,* any activity on the interstate grid affects the rest of the grid. *Ibid. Amici* dispute the States' contentions that electricity functions "the way water flows through a pipe or blood cells flow through a vein" and "can be controlled, directed and traced" as these substances can be, calling such metaphors "inaccurate and highly misleading." *Id.,* at 2, 5.

tions less favorable than those they apply to their own transmissions. *E. g.,* Order No. 888, at 31,643–31,644.[6]

Congress has addressed these evolving conditions in the electricity market on two primary occasions since 1935. First, Congress enacted the Public Utility Regulatory Policies Act of 1978 (PURPA), 92 Stat. 3117, 16 U. S. C. §2601 *et seq.,* to promote the development of new generating facilities and to conserve the use of fossil fuels. Because the traditional utilities controlled the transmission lines and were reluctant to purchase power from "nontraditional facilities," PURPA directed FERC to promulgate rules requiring utilities to purchase electricity from "qualifying cogeneration and small power production facilities." *FERC* v. *Mississippi,* 456 U. S. 742, 751 (1982); see 16 U. S. C. §824a–3(a).

Over a decade later, Congress enacted the Energy Policy Act of 1992 (EPAct), 106 Stat. 2776. This law authorized FERC to order individual utilities to provide transmission services to unaffiliated wholesale generators (*i. e.,* to "wheel" power) on a case-by-case basis. See 16 U. S. C. §§824j–824k. Exercising its authority under the EPAct, FERC ordered a utility to "wheel" power for a complaining wholesale competitor 12 times, in 12 separate proceedings. Order No. 888, at 31,646. FERC soon concluded, however, that these individual proceedings were too costly and time consuming to provide an adequate remedy for undue discrimination throughout the market. *Ibid.*

---

[6] In addition to policing utilities' anticompetitive behavior through the various statutory provisions that explicitly address the electric industry, discussed in more detail below, the Government has also used the antitrust laws to this end. For example, in *Otter Tail Power Co.* v. *United States,* 410 U. S. 366 (1973), the Court permitted the Government to seek antitrust remedies against a utility company which, among other things, refused to sell power at wholesale to some municipalities and refused to transfer competitors' power over its lines. *Id.,* at 368. The Court concluded that the FPA's existence did not preclude the applicability of the antitrust laws. *Id.,* at 372.

Thus, in 1995, FERC initiated the rulemaking proceeding that led to the adoption of the order presently under review. FERC proposed a rule that would "require that public utilities owning and/or controlling facilities used for the transmission of electric energy in interstate commerce have on file tariffs providing for nondiscriminatory open-access transmission services." Notice of Proposed Rulemaking, FERC Stats. & Regs., Proposed Regs., 1988–1999, ¶ 32,514, p. 33,047, 60 Fed. Reg. 17662 (hereinafter NPRM). The stated purpose of the proposed rule was "to encourage lower electricity rates by structuring an orderly transition to competitive bulk power markets." NPRM 33,048. The NPRM stated:

> "The key to competitive bulk power markets is opening up transmission services. Transmission is the vital link between sellers and buyers. To achieve the benefits of robust, competitive bulk power markets, all wholesale buyers and sellers must have equal access to the transmission grid. Otherwise, efficient trades cannot take place and ratepayers will bear unnecessary costs. Thus, market power through control of transmission is the single greatest impediment to competition. Unquestionably, this market power is still being used today, or can be used, discriminatorily to block competition."[7]
> *Id.*, at 33,049.

---

[7] Later in the NPRM, FERC explained that § 206 of the FPA authorizes FERC to remedy unduly discriminatory practices, and found: "that utilities owning or controlling transmission facilities possess substantial market power; that, as profit maximizing firms, they have and will continue to exercise that market power in order to maintain and increase market share, and will thus deny their wholesale customers access to competitively priced electric generation; and that these unduly discriminatory practices will deny consumers the substantial benefits of lower electricity prices." NPRM 33,052.

Rather than grounding its legal authority in Congress' more recent electricity legislation, FERC cited §§ 205–206 of the 1935 FPA—the provisions concerning FERC's power to remedy unduly discriminatory practices—as providing the authority for its rulemaking. See 16 U. S. C. §§ 824d–824e.

In 1996, after receiving comments on the NPRM, FERC issued Order No. 888. It found that electric utilities were discriminating in the "bulk power markets," in violation of § 205 of the FPA, by providing either inferior access to their transmission networks or no access at all to third-party wholesalers of power. Order No. 888, at 31,682–31,684. Invoking its authority under § 206, it prescribed a remedy containing three parts that are presently relevant.

First, FERC ordered "functional unbundling" of wholesale generation and transmission services. Id., at 31,654. FERC defined "functional unbundling" as requiring each utility to state separate rates for its wholesale generation, transmission, and ancillary services, and to take transmission of its own wholesale sales and purchases under a single general tariff applicable equally to itself and to others.

Second, FERC imposed a similar open access requirement on unbundled *retail* transmissions in interstate commerce. Although the NPRM had not envisioned applying the open access requirements to retail transmissions, but rather "would have limited eligibility to wholesale transmission customers," FERC ultimately concluded that it was "irrelevant to the Commission's jurisdiction whether the customer receiving the unbundled transmission service in interstate commerce is a wholesale or retail customer." Id., at 31,689. Thus, "if a public utility voluntarily offers unbundled retail access," or if a State requires unbundled retail access, "the affected retail customer *must* obtain its unbundled transmis-

sion service under a non-discriminatory transmission tariff on file with the Commission." *Ibid.*[8]

Third, FERC rejected a proposal that the open access requirement should apply to "the transmission component of bundled retail sales." *Id.*, at 31,699. Although FERC noted that "the unbundling of retail transmission and generation . . . would be helpful in achieving comparability," it concluded that such unbundling was not "necessary" and would raise "difficult jurisdictional issues" that could be "more appropriately considered" in other proceedings. *Ibid.*

In its analysis of the jurisdictional issues, FERC distinguished between transmissions and sales. It explained:

> "[Our statutory jurisdiction] over sales of electric energy extends only to wholesale sales. However, when a retail transaction is broken into two products that are sold separately (perhaps by two different suppliers: an electric energy supplier and a transmission supplier), we believe the jurisdictional lines change. In this situation, the state clearly retains jurisdiction over the sale of power. However, the unbundled transmission service involves *only* the provision of 'transmission in interstate commerce' which, under the FPA, is exclusively within the jurisdiction of the Commission. Therefore, when a bundled retail sale is unbundled and becomes separate transmission and power sales transactions, the resulting transmission transaction falls within the Federal sphere of regulation." *Id.*, at 31,781.[9]

---

[8] While it concluded that "the rates, terms, and conditions of all unbundled transmission service" were subject to its jurisdiction, FERC stated that it would "give deference to state recommendations" regarding the regulation of retail transmissions "when state recommendations are consistent with our open access policies." Order No. 888, at 31,689.

[9] FERC also explained that it did not assert "jurisdiction to order retail transmission directly to an ultimate consumer," *id.*, at 31,781, and that States had "authority over the *service* of delivering electric energy to

In 1997, in response to numerous petitions for rehearing and clarification, FERC issued Order No. 888–A, FERC Stats. & Regs., Regs. Preambles, July 1996–Dec. 2001, ¶ 31,048, p. 30,172, 62 Fed. Reg. 12274. With respect to various challenges to its jurisdiction, FERC acknowledged that it did not have the "authority to order, *sua sponte,* open-access transmission services by public utilities," but explained that § 206 of the FPA explicitly required it to remedy the undue discrimination that it had found. Order No. 888–A, at 30,202; see 16 U. S. C. § 824e(a). FERC also rejected the argument that its failure to assert jurisdiction over bundled retail transmissions was inconsistent with its assertion of jurisdiction over unbundled retail transmissions. FERC repeated its explanation that it did not believe that regulation of bundled retail transmissions (*i. e.,* the "functional unbundling" of retail transmissions) "was necessary," and again stated that such unbundling would raise serious jurisdictional questions. Order No. 888–A, at 30,225. FERC did not, however, state that it had no power to regu-

---

end users. . . . State regulation of most power production and virtually all distribution and consumption of electric energy is clearly distinguishable from this Commission's responsibility to ensure open and nondiscriminatory interstate transmission service. Nothing adopted by the Commission today, including its interpretation of its authority over retail transmission or how the separate distribution and transmission functions and assets are discerned when retail service is unbundled, is inconsistent with traditional state regulatory authority in this area." *Id.,* at 31,782–31,783.

With respect to distinguishing "Commission-jurisdictional facilities used for transmission in interstate commerce" from "state-jurisdictional local distribution facilities," *id.,* at 31,783, FERC identified seven relevant factors, *id.,* at 31,771, 31,783–31,784. Recognizing the state interest in maintaining control of local distribution facilities, FERC further explained that, "in instances of unbundled retail wheeling that occurs as a result of a state retail access program, we will defer to recommendations by state regulatory authorities concerning where to draw the jurisdictional line under the Commission's technical test for local distribution facilities . . . ." *Id.,* at 31,783–31,785.

late the transmission component of bundled retail sales. *Id.*, at 30,225–30,226. Rather, FERC reiterated that States have jurisdiction over the retail *sale* of power, and stated that, as a result, "[o]ur assertion of jurisdiction . . . arises only if the [unbundled] retail transmission in interstate commerce by a public utility occurs voluntarily or as a result of a state retail program." *Id.*, at 30,226.

## II

A number of petitions for review of Order No. 888 were consolidated for hearing in the Court of Appeals for the District of Columbia. After considering a host of objections, the Court of Appeals upheld most provisions of the order. Specifically, it affirmed FERC's jurisdictional rulings that are at issue in the present cases. 225 F. 3d, at 681.

The Court of Appeals first explained that the open access requirements in the orders—for both retail and wholesale transmissions—were "premised not on individualized findings of discrimination by specific transmission providers, but on FERC's identification of a fundamental systemic problem in the industry." *Id.*, at 683. It held that FERC's factual determinations were reasonable and that §§ 205 and 206 of the FPA gave the Commission authority to prescribe a marketwide remedy for a marketwide problem. Interpreting Circuit precedent—primarily cases involving the transmission of natural gas, *e. g.*, *Associated Gas Distributors* v. *FERC*, 824 F. 2d 981 (CADC 1987)—the Court of Appeals concluded that even though FERC's general authority to order open access was "limited," the statute made an exception "where FERC finds undue discrimination." 225 F. 3d, at 687–688.

In its discussion of "Federal Versus State Jurisdiction over Transmission Services," *id.*, at 690–696, the Court of Appeals also endorsed FERC's reasoning. The Court of Appeals first addressed the complaints of the state regulatory commissions that Order No. 888 "went too far" by going beyond

the regulation of wholesale transactions and "assert[ing] jurisdiction over all unbundled retail transmissions." *Id.*, at 691, 692. The Court of Appeals concluded that the plain language of § 201 of the FPA, which this Court has construed broadly,[10] supported FERC's regulation of transmissions in interstate commerce that were part of unbundled retail sales, as § 201 gives FERC jurisdiction over the "transmission of electric energy in interstate commerce." 16 U. S. C. § 824(b)(1). Even if the FPA were ambiguous, the Court of Appeals explained that, given the technological complexities of the national grids, it would have deferred to the Commission's interpretation of § 201 "as giving it jurisdiction over both wholesale and retail transmissions." 225 F. 3d, at 694.

The Court of Appeals next addressed the complaints of transmission-dependent producers and wholesalers that Order No. 888 did not "go far enough." *Id.*, at 692. The Court of Appeals was not persuaded that FERC's assertion of jurisdiction over unbundled retail transmission required FERC to assert jurisdiction over bundled retail transmissions or to mandate unbundling of retail transmissions. *Id.*, at 694. Noting that the FPA "clearly contemplates state jurisdiction over local distribution facilities and retail sales," the Court of Appeals held:

> "A regulator could reasonably construe transmissions bundled with generation and delivery services and sold to a consumer for a single charge as either transmission services in interstate commerce or as an integral component of a retail sale. Yet FERC has jurisdiction over one, while the states have jurisdiction over the other. FERC's decision to characterize bundled transmissions as part of retail sales subject to state jurisdiction therefore represents a statutorily permissible policy choice to which we must also defer under *Chevron* [*U. S. A. Inc.*

---

[10] See *FPC* v. *Florida Power & Light Co.*, 404 U. S. 453 (1972); *Jersey Central Power & Light Co.* v. *FPC*, 319 U. S. 61 (1943).

v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984)]." *Id.*, at 694–695.

Because of the importance of the proceeding, we granted both the petition of the State of New York et al. (collectively New York) questioning FERC's assertion of jurisdiction over unbundled retail transmissions and the petition of Enron Power Marketing, Inc. (Enron), questioning FERC's refusal to assert jurisdiction over bundled retail transmissions. 531 U. S. 1189 (2001). We address these two questions separately. At the outset, however, we note that no petitioner questions the validity of the order insofar as it applies to wholesale transactions: The parties dispute only the proper scope of FERC's jurisdiction over *retail* transmissions. Furthermore, we are not confronted with any factual issues. Finally, we agree with FERC that transmissions on the interconnected national grids constitute transmissions in interstate commerce. See, *e. g., FPC* v. *Florida Power & Light Co.*, 404 U. S. 453, 466–467 (1972); n. 5, *supra*.

## III

The first question is whether FERC exceeded its jurisdiction by including unbundled retail transmissions within the scope of its open access requirements in Order No. 888. New York argues that FERC overstepped in this regard, and that such transmissions—because they are part of retail transactions—are properly the subject of state regulation. New York insists that the jurisdictional line between the States and FERC falls between the wholesale and retail markets.

As the Court of Appeals explained, however, the landscape of the electric industry has changed since the enactment of the FPA, when the electricity universe was "neatly divided into spheres of retail versus wholesale sales." 225 F. 3d, at 691. As the Court of Appeals also explained, the plain language of the FPA readily supports FERC's claim of jurisdiction. Section 201(b) of the FPA states that FERC's

jurisdiction includes "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." 16 U. S. C. § 824(b). The unbundled retail transmissions targeted by FERC are indeed transmissions of "electric energy in interstate commerce," because of the nature of the national grid. There is no language in the statute limiting FERC's *transmission* jurisdiction to the wholesale market, although the statute does limit FERC's *sale* jurisdiction to that at wholesale. See *ibid.*; cf. *FPC* v. *Louisiana Power & Light Co.*, 406 U. S. 621, 636 (1972) (interpreting similar provisions of the Natural Gas Act, 15 U. S. C. § 717(b), to mean that FPC jurisdiction "applies to interstate 'transportation' regardless of whether the gas transported is ultimately sold retail or wholesale").

In the face of this clear statutory language, New York advances three arguments in support of its submission that the statute draws a bright jurisdictional line between wholesale transactions and retail transactions. First, New York contends that the Court of Appeals applied an erroneous standard of review because it ignored the presumption against federal pre-emption of state law; second, New York claims that other statutory language and legislative history shows a congressional intent to safeguard pre-existing state regulation of the delivery of electricity to retail customers; and third, New York argues that FERC jurisdiction over retail transmissions would impede sound energy policy. These arguments are unpersuasive.

*The Presumption against Pre-emption*

Pre-emption of state law by federal law can raise two quite different legal questions. The Court has most often stated a "presumption against pre-emption" when a controversy concerned not the scope of the Federal Government's authority to displace state action, but rather whether a given state authority conflicts with, and thus has been displaced by,

the existence of Federal Government authority. See, *e. g.,* *Hillsborough County* v. *Automated Medical Laboratories, Inc.,* 471 U. S. 707, 715 (1985) (citing cases); see also *Medtronic, Inc.* v. *Lohr,* 518 U. S. 470, 485 (1996); *Cipollone* v. *Liggett Group, Inc.,* 505 U. S. 504, 518 (1992). In such a situation, the Court "'start[s] with the assumption that the historic police powers of the States were not to be superseded . . . unless that was the clear and manifest purpose of Congress.'" *Hillsborough County,* 471 U. S., at 715 (quoting *Jones* v. *Rath Packing Co.,* 430 U. S. 519, 525 (1977)). These are not such cases, however, because the question presented does not concern the validity of a conflicting state law or regulation.

The other context in which "pre-emption" arises concerns the rule "that a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority[,] . . . [for] an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n* v. *FCC,* 476 U. S. 355, 374 (1986). This is the sort of case we confront here—defining the proper scope of the federal power. Such a case does not involve a "presumption against pre-emption," as New York argues, but rather requires us to be certain that Congress has conferred authority on the agency. As we have explained, the best way to answer such a question— *i. e.,* whether federal power may be exercised in an area of pre-existing state regulation—"is to examine the nature and scope of the authority granted by Congress to the agency." *Ibid.* In other words, we must interpret the statute to determine whether Congress has given FERC the power to act as it has, and we do so without any presumption one way or the other.

As noted above, the text of the FPA gives FERC jurisdiction over the "transmission of electric energy in interstate commerce and . . . the sale of electric energy at wholesale in

interstate commerce." 16 U. S. C. § 824(b). The references to "transmission" in commerce and "sale" at wholesale were made part of § 201 of the statute when it was enacted in 1935.[11] Subsections (c) and (d) of § 201 explain, respectively, the meaning of the terms "transmission" and "sale of electric energy at wholesale."[12] This statutory text thus unambiguously authorizes FERC to assert jurisdiction over two sepa-

---

[11] This reference is found twice in § 201 of the FPA. Section 201(a), as codified in 16 U. S. C. § 824(a), states in full: "It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of *the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce* is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States." (Emphasis added.)

Section 201(b)(1), as codified in 16 U. S. C. § 824(b)(1), states in full: "The provisions of this subchapter shall apply to *the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce*, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter." (Emphasis added.)

[12] Section 201(c) of the FPA, as codified in 16 U. S. C. § 824(c), explains that "[f]or the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States." Finally, § 201(d), as codified in 16 U. S. C. § 824(d), states that the "term 'sale of electric energy at wholesale' when used in this subchapter, means a sale of electric energy to any person for resale."

rate activities—transmitting and selling. It is true that FERC's jurisdiction over the *sale* of power has been specifically confined to the wholesale market. However, FERC's jurisdiction over electricity *transmissions* contains no such limitation. Because the FPA authorizes FERC's jurisdiction over interstate transmissions, without regard to whether the transmissions are sold to a reseller or directly to a consumer, FERC's exercise of this power is valid.

*Legislative History*

Attempting to discredit this straightforward analysis of the statutory language, New York calls our attention to numerous statements in the legislative history indicating that the 1935 Congress intended to do no more than close the "*Attleboro* gap," by providing for federal regulation of wholesale, interstate electricity transactions that the Court had held to be beyond the reach of state authority in *Attleboro*, 273 U. S., at 89. To support this argument, and to demonstrate that the 1935 Congress did not intend to supplant any traditionally state-held jurisdiction, New York points to language added to the FPA in the course of the legislative process that evidences a clear intent to preserve state jurisdiction over local facilities. For example, § 201(a) provides that federal regulation is "to extend only to those matters which are not subject to regulation by the States." 16 U. S. C. § 824(a). And § 201(b) states that FERC has no jurisdiction "over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter." 16 U. S. C. § 824(b).

It is clear that the enactment of the FPA in 1935 closed the "*Attleboro* gap" by authorizing federal regulation of interstate, wholesale sales of electricity—the precise subject matter beyond the jurisdiction of the States in *Attleboro*. And it is true that the above-quoted language from § 201(a) concerning the States' reserved powers is consistent with

the view that the FPA was no more than a gap-closing statute. It is, however, perfectly clear that the original FPA did a good deal more than close the gap in state power identified in *Attleboro.* The FPA authorized federal regulation not only of wholesale sales that had been beyond the reach of state power, but also the regulation of wholesale sales that had been *previously subject* to state regulation. See, *e. g., Attleboro,* 273 U. S., at 85–86 (noting, prior to the enactment of the FPA, that States could regulate aspects of interstate wholesale sales, as long as such regulation did not directly burden interstate commerce). More importantly, as discussed above, the FPA authorized federal regulation of interstate *transmissions* as well as of interstate wholesale sales, and such transmissions were not of concern in *Attleboro.* Thus, even if *Attleboro* catalyzed the enactment of the FPA, *Attleboro* does not define the outer limits of the statute's coverage.

Furthermore, the portion of § 201(a) cited by New York concerning the preservation of existing state jurisdiction is actually consistent with Order No. 888, because unbundled interstate transmissions of electric energy have never been "subject to regulation by the States," 16 U. S. C. § 824(a). Indeed, unbundled transmissions have been a recent development. As FERC explained, at the time that the FPA was enacted, transmissions were bundled with the energy itself, and electricity was delivered to both wholesale and retail customers as a complete, bundled package. Order No. 888, at 31,639. Thus, in 1935, there was neither state nor federal regulation of what did not exist.[13]

---

[13] FERC recognized this point in reaching its jurisdictional conclusion: "Rather than claiming 'new' jurisdiction, the Commission is applying the same statutory framework to a business environment in which . . . retail sales and transmission service are provided in separate transactions. . . . Because these types of products and transactions were not prevalent in the past, the jurisdictional issue before us did not arise and . . . the Commission cannot be viewed as 'disturbing' the jurisdiction of state regulators prior to and after the *Attleboro* case." Order No. 888–A, at 30,339–30,340.

■■■■

■■■

Moreover, we have described the precise reserved state powers language in § 201(a) as a mere "'policy declaration'" that "'cannot nullify a clear and specific grant of jurisdiction, even if the particular grant seems inconsistent with the broadly expressed purpose.'" *FPC* v. *Southern Cal. Edison Co.*, 376 U. S. 205, 215 (1964) (quoting *Connecticut Light & Power Co.* v. *FPC*, 324 U. S. 515, 527 (1945)); see also *United States* v. *Public Util. Comm'n of Cal.*, 345 U. S. 295, 311 (1953). Because the FPA contains such "a clear and specific grant of jurisdiction" to FERC over interstate transmissions, as discussed above, the prefatory language cited by New York does not undermine FERC's jurisdiction.

New York is correct to point out that the legislative history is replete with statements describing Congress' intent to preserve state jurisdiction over local facilities. The sentiment expressed in those statements is incorporated in the second sentence of § 201(b) of the FPA, as codified in 16 U. S. C. § 824(b), which provides:

> "The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter."

Yet, Order No. 888 does not even arguably affect the States' jurisdiction over three of these subjects: generation facilities, transmissions in intrastate commerce, or transmissions consumed by the transmitter. Order No. 888 does discuss local distribution facilities, and New York argues that, as a result, FERC has improperly invaded the States' authority "over facilities used in local distribution," 16 U. S. C. § 824(b). However, FERC has not attempted to control local distri-

bution facilities through Order No. 888. To the contrary, FERC has made clear that it does not have jurisdiction over such facilities, Order No. 888, at 31,969, and has merely set forth a seven-factor test for identifying these facilities, without purporting to regulate them, *id.*, at 31,770–31,771.

New York also correctly states that the legislative history demonstrates Congress' interest in retaining state jurisdiction over retail sales. But again, FERC has carefully avoided assuming such jurisdiction, noting repeatedly that "the FPA does not give the Commission jurisdiction over sales of electric energy at retail." *Id.*, at 31,969. Because federal authority has been asserted only over unbundled *transmissions,* New York retains jurisdiction of the ultimate sale of the *energy.* And, as discussed below, FERC did not assert jurisdiction over bundled retail transmissions, leaving New York with control over even the transmission component of bundled retail sales.

Our evaluation of the extensive legislative history reviewed in New York's brief is affected by the importance of the changes in the electricity industry that have occurred since the FPA was enacted in 1935. No party to these cases has presented evidence that Congress foresaw the industry's transition from one of local, self-sufficient monopolies to one of nationwide competition and electricity transmission. Nor is there evidence that the 1935 Congress foresaw the possibility of unbundling electricity transmissions from sales. More importantly, there is no evidence that if Congress had foreseen the developments to which FERC has responded, Congress would have objected to FERC's interpretation of the FPA. Whatever persuasive effect legislative history may have in other contexts, here it is not particularly helpful because of the interim developments in the electric industry. Thus, we are left with the statutory text as the clearest guidance. That text unquestionably supports FERC's jurisdiction to order unbundling of wholesale transactions (which

none of the parties before us questions), as well as to regulate the unbundled transmissions of electricity retailers.

*Sound Energy Policy*

New York argues that FERC jurisdiction over unbundled retail transmission will impede sound energy policy. Specifically, New York cites the States' interest in overseeing the maintenance of transmission lines and the siting of new lines. It is difficult for us to evaluate the force of these arguments because New York has not separately analyzed the impact of the loss of control over unbundled retail transmissions, as opposed to the loss of control over retail transmissions generally, and FERC has only regulated unbundled transactions. Moreover, FERC has recognized that the States retain significant control over local matters even when retail transmissions are unbundled. See, *e. g.,* Order No. 888, at 31,782, n. 543 ("Among other things, Congress left to the States authority to regulate generation and transmission siting"); *id.,* at 31,782, n. 544 ("This Final Rule will not affect or encroach upon state authority in such traditional areas as the authority over local service issues, including reliability of local service; administration of integrated resource planning and utility buy-side and demand-side decisions, including DSM [demand-side management]; authority over utility generation and resource portfolios; and authority to impose nonbypassable distribution or retail stranded cost charges"). We do note that the Edison Electric Institute, which is a party to these cases, and which represents that its members own approximately 70% of the transmission facilities in the country, does not endorse New York's objections to Order No. 888. And, regardless of their persuasiveness, the sort of policy arguments forwarded by New York are properly addressed to the Commission or to the Congress, not to this Court. *E. g., Chemehuevi Tribe* v. *FPC,* 420 U. S. 395, 423 (1975).

## IV

Objecting to FERC's order from the opposite direction, Enron argues that the FPA gives FERC the power to apply its open access remedy to *bundled* retail transmissions of electricity, and, given FERC's findings of undue discrimination, that FERC had a duty to do so. In making this argument, Enron persistently claims that FERC held that it had no jurisdiction to grant the relief that Enron seeks.[14] That assumption is incorrect: FERC chose not to assert such jurisdiction, but it did not hold itself powerless to claim jurisdiction. Indeed, FERC explicitly reserved decision on the jurisdictional issue that Enron claims FERC decided. See Order No. 888, at 31,699 (explaining that Enron's position raises "numerous difficult jurisdictional issues that we believe are more appropriately considered when the Commission reviews unbundled retail transmission tariffs that may come before us in the context of a state retail wheeling program"). Absent Enron's flawed assumption, FERC's ruling is clearly acceptable.

---

[14] See, *e. g.*, Brief for Petitioner in No. 00–809, p. 12 ("FERC . . . held itself powerless to address the vast majority of the problem"); *id.*, at 14 ("FERC determined, however, that it did not have authority to extend its functional unbundling remedy to transmissions for bundled retail sales"); *id.*, at 18 ("FERC's decision that it did not have jurisdiction to apply [an open access transmission tariff] to transmissions for bundled retail sales was contrary to law"); *id.*, at 20 ("[FERC found] no jurisdiction when the cost of the transmission is bundled with the cost of power at retail").

Surprisingly, FERC seemed to agree with Enron's characterization of its holding at some places in its own brief. *E. g.*, Brief for Respondent FERC 44–45 ("The Commission reasonably concluded that *Congress has not authorized* federal regulation of the transmission component of bundled retail sales of electric energy" (emphasis added)). Yet, FERC's brief also stated more accurately that FERC had decided not to assert jurisdiction, rather than concluded that it lacked the power to do so. *E. g.*, *id.*, at 15 ("[FERC] was not asserting jurisdiction to order utilities to unbundle their retail services . . ."); *id.*, at 49 (citing "the Commission's reasonable decision not to override the States' historical regulation of transmission that is bundled with a retail sale of energy").

As noted above, in both Order No. 888 and rehearing Order No. 888–A, FERC gave two reasons for refusing to extend its open access remedy to bundled retail transmissions. First, FERC explained that such relief was not "necessary." Order No. 888, at 31,699; see also Order No. 888–A, at 30,225. Second, FERC noted that the regulation of bundled retail transmissions "raises numerous difficult jurisdictional issues" that did not need to be resolved in the present context. Order No. 888, at 31,699; see also Order No. 888–A, at 30,225–30,226. Both of these reasons provide valid support for FERC's decision not to regulate bundled retail transmissions.

First, with respect to FERC's determination that it was not "necessary" to include bundled retail transmissions in its remedy, it must be kept in mind exactly what it was that FERC sought to remedy in the first place: a problem with the *wholesale* power market. FERC's findings, as Enron itself recognizes, concerned electric utilities' use of their market power to "'deny their *wholesale* customers access to competitively priced electric generation,'" thereby "'deny[ing] consumers the substantial benefits of lower electricity prices.'" Brief for Petitioner in No. 00–809, pp. 12–13 (quoting NPRM 33,052) (emphasis added). The title of Order No. 888 confirms FERC's focus: "Promoting *Wholesale Competition* Through Open Access Non-Discriminatory Transmission Services . . . ." Order No. 888, at 31,632 (emphasis added). Indeed, FERC has, from the outset, identified its goal as "facilitat[ing] competitive *wholesale* electric power markets." NPRM 33,049 (emphasis added).

To remedy the wholesale discrimination it found, FERC chose to regulate all wholesale transmissions. It also regulated unbundled retail transmissions, as was within its power to do. See Part III, *supra.* However, merely because FERC believed that those steps were appropriate to remedy discrimination in the wholesale electricity market does not, as Enron alleges, lead to the conclusion that the regulation

of *bundled* retail transmissions was "necessary" as well. Because FERC determined that the remedy it ordered constituted a sufficient response to the problems FERC had identified in the wholesale market, FERC had no § 206 obligation to regulate bundled retail transmissions or to order universal unbundling.[15]

Of course, it may be true that FERC's findings concerning discrimination in the wholesale electricity market suggest that such discrimination exists in the retail electricity market as well, as Enron alleges. Were FERC to investigate this alleged discrimination and make findings concerning undue discrimination in the retail electricity market, § 206 of the FPA would require FERC to provide a remedy for that discrimination. See 16 U. S. C. § 824e(a) (upon a finding of undue discrimination, "the Commission shall determine the just and reasonable . . . regulation, practice, or contract . . . and shall fix the same by order"). And such a remedy could very well involve FERC's decision to regulate bundled retail transmissions—Enron's desired outcome. However, because the scope of the order presently under review did not concern discrimination in the retail market, Enron is wrong to argue that § 206 requires FERC to provide a full array of retail-market remedies.

Second, we can agree with FERC's conclusion that Enron's desired remedy "raises numerous difficult jurisdictional issues," Order No. 888, at 31,699, without deciding whether Enron's ultimate position on those issues is correct. The issues raised by New York concerning FERC's jurisdiction over unbundled retail transmissions are themselves serious.

---

[15] Indeed, given FERC's acknowledgment "that recovery of legitimate stranded costs is critical to the successful transition of the electric utility industry from a tightly regulated, cost-of-service utility industry to an open access, competitively priced power industry," NPRM 33,052, it was appropriate for FERC to confine the scope of its remedy to what was truly "necessary": the broader the remedy, the more complicated FERC's already challenging goal of permitting utilities to recover stranded costs.

See Part III, *supra*.  It is obvious that a federal order claiming jurisdiction over *all* retail transmissions would have even greater implications for the States' regulation of retail sales—a state regulatory power recognized by the same statutory provision that authorizes FERC's transmission jurisdiction.  See 16 U. S. C. § 824(b) (giving FERC jurisdiction over "transmission of electric energy," but recognizing state jurisdiction over "any . . . sale of electric energy" other than "sale of electric energy at wholesale").  But even if we assume, for present purposes, that Enron is *correct* in its claim that the FPA gives FERC the authority to regulate the transmission component of a bundled retail sale, we nevertheless conclude that the agency had discretion to decline to assert such jurisdiction in this proceeding in part because of the complicated nature of the jurisdictional issues.  Like the Court of Appeals, we are satisfied that FERC's choice not to assert jurisdiction over bundled retail transmissions in a rulemaking proceeding focusing on the wholesale market "represents a statutorily permissible policy choice."  225 F. 3d, at 694–695.

Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE SCALIA and JUSTICE KENNEDY join, concurring in part and dissenting in part.

Today the Court finds that the Federal Energy Regulatory Commission (FERC or Commission) properly construed its statutory authority when it determined that: (1) it may require a utility that "unbundles" the cost of transmission from the cost of electric energy to transmit competitors' electricity over its lines on the same terms that the utility applies to its own energy transmissions; and (2) it need not impose that requirement on utilities that continue to offer only "bundled" retail sales.  Under the Federal Power Act (FPA), 16

U. S. C. § 824 *et seq.*, FERC has jurisdiction over all interstate transmission, regardless of the type of transaction with which it is associated, and I concur in the Court's holding with respect to transmission used for unbundled retail sales and join Parts II and III of its opinion. I dissent, however, from the Court's resolution of the question concerning transmission used for bundled retail sales because I believe that the Court fails to properly assess both the Commission's jurisdictional analysis and its justification for excluding bundled retail transmission from the Open Access Transmission Tariff (OATT). FERC's explanations are inadequate and do not warrant our deference.

I

While the Court does not foreclose the possibility that FERC's jurisdiction extends to transmission associated with bundled retail sales, the Court defers to FERC's decision not to apply the OATT to such transmission on the ground that the Commission made a permissible policy choice, *ante*, at 28 (quoting *Transmission Access Policy Study Group* v. *FERC*, 225 F. 3d 667, 694–695 (CADC 2000)), and by reference to FERC's assertions that: (1) such relief was not "necessary," *ante*, at 26 (citing Order No. 888, FERC Stats. & Regs., Regs. Preambles, Jan. 1991–June 1996, ¶ 31,036, p. 31,699; Order No. 888–A, FERC Stats. & Regs., Regs. Preambles, July 1996–Dec. 2001, ¶ 31,048, p. 30,225); and (2) "the regulation of bundled retail transmissions 'raises numerous difficult jurisdictional issues' that did not need to be resolved in the present context." *Ante*, at 26 (citing Order No. 888, at 31,699; Order No. 888–A, at 30,225–30,226). The Court concludes that both reasons "provide valid support for FERC's decision not to regulate bundled retail transmissions." *Ante*, at 26.[1]

_____

[1] I note that the "reasons" upon which the Court relies were made only in the specific context of FERC's explanation of its decision not to unbundle retail transmission and distribution. Order No. 888, at 31,698–31,699. The comments were not given as a general explanation for FERC's

I disagree. The Court defers to the Court of Appeals' characterization of FERC's decision as a "policy choice," rather than to any such characterization made by FERC itself.[2] But a *post-hoc* rationalization offered by the Court of Appeals is an insufficient basis for deference. "[A]n agency's action must be upheld, if at all, *on the basis articulated by the agency itself.*" *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 50 (1983) (emphasis added).

Therefore, in order to properly assess FERC's decision not to apply the OATT to transmission connected to bundled retail sales, we must carefully evaluate the two justifications that the Court points to and relies on. Neither is sufficient. As I discuss below, FERC failed to explain why regulating such transmission is not "necessary," and FERC's inconclusive jurisdictional analysis does not provide a sound basis for our deference.

A

I cannot support the Court's reliance on FERC's explanation that "[a]lthough the unbundling of retail transmission and generation, as well as wholesale transmission and generation, would be helpful in achieving comparability, we do not believe it is necessary." Order No. 888, at 31,699. Aside from this conclusory statement, FERC provides no explanation as to why such regulation is unnecessary and attaches no findings to support this single statement. As such, we

---

decision not to apply the OATT to transmission associated with bundled retail sales, and FERC did not rely on the second explanation in Order No. 888–A. See *infra*, at 41.

[2] Specifically, the Court of Appeals stated that, in light of the fact that a regulator could reasonably construe the transmission component of bundled retail sales as either part of a retail sale or a transmission service in interstate commerce, "FERC's decision to characterize bundled transmissions as part of retail sales subject to state jurisdiction therefore represents a statutorily permissible policy choice to which we must also defer under *Chevron* [*U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984)]." 225 F. 3d 667, 694–695 (CADC 2000).

have no basis for determining whether FERC's decision is justified. A brief review of the electric industry, and the nature of transmission in particular, further calls into question both FERC's conclusory statement and its logical inference: That regulation of transmission is not necessary when used in connection with one type of transaction but is necessary when used for another.

An electric power system consists of three divisions: generation, transmission, and local distribution. Electricity is generated at power plants where "a fuel such as coal, gas, oil, uranium or hydro power is used to spin a turbine which turns a generator to generate electricity." Brief for Electrical Engineers et al. as *Amici Curiae* 12 (hereinafter Brief for Electrical Engineers). "[G]enerating stations continuously feed electric energy into a web of transmission lines (loosely referred to as 'the grid') at very high voltages." P. Fox-Penner, Electric Utility Restructuring: A Guide to the Competitive Era 5 (1997) (hereinafter Fox-Penner). The transmission lines in turn feed "*substations* (essentially transformers) that reduce voltage and spread the power from each transmission line to many successively smaller *distribution* lines, culminating at the retail user." *Id.*, at 23.[3]

Unlike the other electricity components—and with the exception of transmission in Alaska, Hawaii, and parts of Texas—transmission is inherently interstate.[4] It takes place over a network or grid, which consists of a configura-

---

[3] At the local distribution centers, "the power flow is split to send power to a number of primary feeder lines that lead to other transformers that again step down and feed the power to secondary service lines that in turn deliver the power to the utility's customers." Brief for Electrical Engineers 13.

[4] In the contiguous United States, this system is composed of three major grids: the Eastern Interconnection, the Western Interconnection, and the Texas Interconnection. Restructuring of the Electric Power Industry: A Capsule of Issues and Events, Energy Information Administration 6 (DOE/EIA–X037, Jan. 2000).

tion of interconnected transmission lines that cross state lines. Brief for Electrical Engineers 13. These lines are owned and operated by the Nation's larger utilities. No individual utility, however, has "'control over the actual transfers of electric power and energy with any particular electric system with which it is interconnected.'" *Id.*, at 15 (quoting *Florida Power & Light Co.*, 37 F. P. C. 544, 549 (1967)). Electricity flows at extremely high voltages across the network in uncontrollable ways and cannot be easily directed through a particular path from a specific generator to a consumer. Fox-Penner 26–27. The "[t]ransfer of electricity from one point to another will, to some extent, flow over all transmission lines in the interconnection, not just those in the direct path of the transfer." Van Nostrand's Scientific Encyclopedia 1096 (D. Considine ed., 8th ed. 1995). The energy flow depends on "where the load (demand for electricity) and generation are at any given moment, with the energy always following the path (or paths) of least resistance." Brief for Electrical Engineers 13. The paths, however, "change moment by moment." Fox-Penner 27. And "[t]rying to predict the flow of electrons is akin to putting a drop of ink into a water pipe flowing into a pool, and then trying to predict how the ink drop will diffuse into the pool, and which combination of outflow pipes will eventually contain ink." *Ibid.*

Nonetheless, buyers and sellers do negotiate particular contract paths, "route[s] *nominally* specified in an agreement to have electricity transmitted between two points." T. Brennan, Shock to the System 76 (1996) (emphasis added).[5]

---

[5] FERC notes that whether transmission is in interstate commerce "does not turn on whether the contract path for a particular power or transmission sale crosses state lines, but rather follows the physical flow of electricity." Order No. 888, Appendix G, at 31,968. FERC states that "[b]ecause of the highly integrated nature of the electric system, this results in most transmission of electric energy being 'in interstate commerce.'" *Ibid.*

In practice, however, it is quite possible that most of the power will never flow over the negotiated transmission lines. The transactional arrangements, therefore, bear little resemblance to the physical behavior of electricity transmitted on a power grid and, as such, it is impossible for either a utility or FERC to isolate or distinguish between the transmission used for bundled or unbundled wholesale or retail sales.

Given that it is impossible to identify which utility's lines are used for any given transmission, FERC's decision to exclude transmission because it is associated with a particular type of transaction appears to make little sense. And this decision may conflict with FERC's statutory mandate to regulate when it finds unjust, unreasonable, unduly discriminatory, or preferential treatment with respect to any transmission subject to its jurisdiction. See 16 U. S. C. §§ 824d, 824e.[6] FERC clearly recognizes the statute's mandate, stating in Order No. 888–A that "our authorities under the FPA not only permit us to adapt to changing economic realities in the electric industry, but also require us to do so, as necessary to eliminate undue discrimination and protect electric-

---

[6] Section 824d(b), for example, provides:

"No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service."

Section 824e(a) further provides that whenever FERC, after conducting a hearing, finds that "any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affect[ing] such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, *the Commission shall determine* the just and reasonable rate, charge, classification, . . . practice, or contract to be thereafter observed and in force, and shall fix the same by order." (Emphasis added.)

ity customers." Order No. 888–A, at 30,176.[7] And it is certainly possible that utilities that own or control lines on the grid discriminate against entities that seek to use their transmission lines regardless of whether the utilities themselves bundle or unbundle their transactions.[8] The fact that FERC found undue discrimination with respect to transmission used in connection with both bundled and unbundled wholesale sales and unbundled retail sales indicates that such discrimination exists regardless of whether the transmission is used in bundled or unbundled sales. Without more, FERC's conclusory statement that "unbundling of retail transmission" is not "necessary" lends little support to its decision not to regulate such transmission. And it sim-

---

[7] FERC likewise states in Order No. 888, at 31,634, that the "legal and policy cornerstone of these rules is to remedy undue discrimination in access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce." FERC also recognized that to comply with the statute's mandate, it "must eliminate the remaining patchwork of closed and open jurisdictional transmission systems and ensure that all these systems, including those that already provide some form of open access, cannot use monopoly power over transmission to unduly discriminate against others." *Id.*, at 31,635.

[8] For example, the Electric Power Supply Association explains that transmission owning utilities may discriminate against entities that seek to use their transmission systems, thereby preventing the entities from using their lines, in the following ways: (1) They may block available transfer capacity—the capability of the physical transmission network to facilitate activity over and above its committed uses—by overscheduling transmission for their own retail loads across "valuable" transmission paths; (2) they may improperly avoid certain costs that other entities would be subject to; or (3) they may fail to make accurate disclosure of available transfer capability, causing "serious difficulties for suppliers attempting to schedule electricity sales across their transmission facilities." Brief for Respondent Electric Power Supply Association 7–9. Similarly, petitioner Enron explains that a "utility can reserve superior transmission capacity for its own bundled retail sales, at times even closing its facilities to other transmissions . . . forcing competitors of the utility to scramble for less direct, less predictable and more expensive transmission options." Brief for Petitioner in No. 00–809, pp. 41–42.

ply cannot be the case that the nature of the commercial transaction controls the scope of FERC's jurisdiction.

To be sure, I would not prejudge whether FERC *must* require that transmission used for bundled retail sales be subject to FERC's open access tariff. At a minimum, however, FERC should have determined whether regulating transmission used in connection with bundled retail sales was in fact "necessary to eliminate undue discrimination and protect electricity customers." *Ibid.* FERC's conclusory statement instills little confidence that it either made this determination or that it complied with the unambiguous dictates of the statute. While the Court essentially ignores the statute's mandatory prescription by approving of FERC's decision as a permissible "policy choice," the FPA simply does not give FERC discretion to base its decision not to remedy undue discrimination on a "policy choice."

The Court itself struggles to find support for FERC's conclusion that it was not "necessary" to regulate bundled retail transmission in order to remedy discrimination. First, the Court points to the fact that FERC's findings concerned electric utilities' use of their market power to "'deny their *wholesale* customers access to competitively priced electric generation,' thereby 'deny[ing] consumers the substantial benefits of lower electricity prices.'" *Ante*, at 26 (quoting Brief for Petitioner in No. 00–809, pp. 12–13). Second, the Court notes that the title of Order No. 888 confirms FERC's focus because it references promoting wholesale competition. *Ante*, at 26. Finally, the Court relies on the fact that FERC has identified its goal as "'facilitat[ing] competitive *wholesale* electric power markets.'" *Ibid.* (quoting Notice of Proposed Rulemaking, FERC Stats. & Regs., Proposed Regs., 1988–1999, ¶ 32,514, p. 33,049; 60 Fed. Reg. 17662).

I fail to understand how these statements support FERC's determination that it was not "necessary" to regulate bundled retail transmission. Utilities that bundle may use their market power to discriminate against those seeking access

to the lines in connection with *either* retail or wholesale sales. It is certainly possible, perhaps even likely, that the only way to remedy undue discrimination and ensure open access to transmission services is to regulate *all* utilities that operate transmission facilities, and not just those that use their own lines for the purpose of wholesale sales or in connection with unbundled retail transactions. FERC does not suggest that the only entities that engage in discriminatory behavior are those that use their transmission facilities for wholesale sales or unbundled retail sales. And relying on FERC's reference to wholesale markets makes little sense when FERC regulates transmission connected to retail sales so long as the transmission is in a State that unbundles retail sales or where the utility voluntarily unbundles. See *infra,* at 41–42.

"We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner . . . ." *Motor Vehicle Mfrs. Assn.,* 463 U. S., at 48. Here, FERC's failure to do so prevents us from evaluating whether or not the agency engaged in reasoned decisionmaking when it determined that it was not "necessary" to regulate bundled retail transmission.

## B

The Court also relies on FERC's explanation that the prospect of unbundling retail transmission and generation "raises numerous difficult jurisdictional issues that we believe are more appropriately considered when the Commission reviews unbundled retail transmission tariffs that may come before us in the context of a state retail wheeling program." Order No. 888, at 31,699. The Court provides the following explanation for its decision to rely on this statement:

> "But even if we assume, for present purposes, that Enron is *correct* in its claim that the FPA gives FERC the authority to regulate the transmission component of

a bundled retail sale, we nevertheless conclude that the agency had discretion to decline to assert such jurisdiction in this proceeding in part because of the complicated nature of the jurisdictional issues." *Ante,* at 28.

This explanation is wholly unsatisfying, both because the Court's reliance on FERC's statement fails to take into account the unambiguous language of the statute and because FERC has given various inconsistent explanations of its jurisdiction.

1

FERC's statement implies that its decision not to regulate was based, at least in part, both on a determination that the statute is ambiguous and on a determination that certain interstate transmission may fall outside of its jurisdiction. The FPA, however, unambiguously grants FERC jurisdiction over the interstate transmission of electric energy in interstate commerce. 16 U. S. C. § 824(b)(1). As the Court notes, "[t]here is no language in the statute limiting FERC's *transmission* jurisdiction to the wholesale market." *Ante,* at 17. The Court correctly recognizes that "the FPA authorizes FERC's jurisdiction over interstate transmissions, without regard to whether the transmissions are sold to a reseller or directly to a consumer." *Ante,* at 20.

Similarly, although FERC draws a jurisdictional line between transmission used in connection with bundled and unbundled retail sales, the statute makes no such distinction. The terms "bundled" and "unbundled" are not found in the statute.[9] The only jurisdictional line that the statute draws with regard to transmission is between interstate and intrastate. See § 824(b)(1). Congress does not qualify its grant

---

[9] The difference between the two types of sales is that with an unbundled retail sale, a utility, either voluntarily or pursuant to state law, presents separate charges for the electricity, the transmission service, and the delivery service. In a bundled sale, all components are combined as one charge. See Brief for Petitioner in No. 00–809, at 4–5.

to FERC of jurisdiction over interstate transmission. Nor does the Court explain how the statute grants FERC jurisdiction over unbundled retail transmission, yet is ambiguous with respect to the question of bundled retail transmission.

Even if I agreed that the statute is ambiguous, FERC did not purport to resolve an ambiguity in the passage upon which the Court relies. Instead, FERC *refused to resolve* what it considered to be a statutory ambiguity, in part because it determined that resolving this question was too difficult. Thus, while under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984), the Court will defer to an agency's reasonable *interpretation* of an ambiguous statute, this passage does not provide an interpretation to which the Court can defer.

2

FERC does provide more explicit interpretations of its jurisdiction elsewhere. It is difficult, however, to isolate FERC's position on this matter because FERC presents different interpretations in its orders, its brief, and at oral argument. At certain points, FERC affirmatively states that it lacks jurisdiction to regulate this transmission; at other times, FERC is noncommittal. The Court's heavy reliance on *one* statement, therefore, is misplaced. And while the Court recognizes in a footnote that FERC made conflicting representations, see *ante*, at 25, n. 14, in deciding to defer to the agency the Court fails to place any weight on the fact that the agency presented inconsistent positions. See *United States* v. *Mead Corp.*, 533 U. S. 218, 228 (2001) ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position . . ."). These inconsistencies alone, however, convince me that the Court should neither defer to the aforementioned statement of FERC's

jurisdiction nor rely on any other explanation provided by FERC.

For example, in its brief FERC argues that because the statute is ambiguous, the Court of Appeals properly deferred under *Chevron* to FERC's reasonable decision not to regulate. Brief for Respondent FERC 49. FERC then contends that it made a reasonable finding that it *lacked* jurisdiction over the transmission component of bundled retail sales and that it was therefore not required to regulate the transmission component. *Id.*, at 49–50; see also *id.*, at 44 ("The Commission reasonably concluded that Congress has not authorized federal regulation of the transmission component of bundled retail sales of electric energy"). The brief also notes, however, that FERC *has* attempted to regulate transmission connected to retail bundled sales and maintains that it continues to believe that it has authority to require public utilities to treat customers of unbundled interstate transmission in a manner comparable to the treatment afforded bundled transmission users. *Id.*, at 48.[10]

At oral argument, FERC proposed a different explanation. It stated that the agency was not disclaiming its authority to order the unbundling of the transmission component of a

---

[10] FERC earlier rejected the proposed curtailment provisions of a public utility's federal OATT that favored the utility's bundled retail customers over its wholesale transmission customers. It asserted that, in compliance with Order No. 888 and in order to enforce the OATT, it could regulate transmission curtailment in a manner that had an indirect effect upon the utility's services to its retail customers. Brief for Respondent FERC 48; see *Northern States Power Co.* v. *FERC,* 176 F. 3d 1090, 1095 (CA8 1999). The United States Court of Appeals for the Eighth Circuit, noting that "FERC concede[d] that it has no jurisdiction whatsoever over the state's regulation of [the utility's] bundled retail sales activities," held that FERC exceeded its authority under the FPA. *Id.,* at 1096. While I do not endorse the court's conclusion with respect to FERC's jurisdiction, I note that the Court of Appeals pointed to the inconsistencies in FERC's position, explaining that "FERC's observation that no inherent conflict exists between its mandates and practical application is viewed through an adversarial bias." *Id.,* at 1094.

retail sale. Tr. of Oral Arg. 42–43. FERC explained that it lacks jurisdiction over the transmission *"as long as* the State hasn't unbundled [the retail sale], the utility has not unbundled it, and FERC has not exercised whatever authority it would have to unbundle it." *Id.,* at 50 (emphasis added).

FERC's orders present still more views of its jurisdiction. As already noted, when considering whether FERC should unbundle retail transmission and generation, FERC asserts that this particular question "raises numerous difficult jurisdictional issues" more appropriately considered at a later time. Order No. 888, at 31,699. FERC, at other points, however, makes clear its belief that there *is* a jurisdictional line between unbundled and bundled retail transmission. Explaining its "legal determination" that it has exclusive jurisdiction over unbundled retail transmission in interstate commerce, FERC notes that it found "compelling the fact that section 201 of the FPA, *on its face,* gives the Commission jurisdiction over transmission in interstate commerce (by public utilities) without qualification." *Id.,* at 31,781. Nonetheless, when addressing why "its authority attaches only to unbundled, but not bundled, retail transmission in interstate commerce," FERC affirmatively states that "we believe that when transmission is sold at retail as part and parcel of the delivered product called electric energy, the transaction is a sale of electric energy at retail" and that "[u]nder the FPA, the Commission's jurisdiction over sales of electric energy extends only to wholesale sales." *Ibid.*

By contrast, when the "retail transaction is broken into two products that are sold separately," FERC "believe[s] the jurisdictional lines change." *Ibid.* FERC explains:

"In this situation, the state clearly retains jurisdiction over the sale of the power. However, the unbundled transmission service involves *only* the provision of 'transmission in interstate commerce' which, under the FPA, is exclusively within the jurisdiction of the Com-

mission. Therefore, when a bundled retail sale is un-bundled and becomes separate transmission and power sales transactions, the resulting transmission trans-action falls within the Federal sphere of regulation." *Ibid.*

FERC here concludes that the *act of unbundling itself* changes its jurisdictional lines. Unbundling, FERC notes, may occur in one of two ways: (1) voluntarily by a public utility or (2) as a result of a state retail access program that orders unbundling. *Ibid.* Either action brings the transmission within the scope of FERC's jurisdiction.

Subsequently, in Order No. 888–A, FERC responded to rehearing requests by supplanting its earlier conclusion that "the matter raises numerous difficult jurisdictional issues" with the explanation quoted above from Order No. 888, at 31,781. See Order No. 888–A, at 30,225. It is possible, therefore, that FERC abandoned its "difficult jurisdictional issues" explanation altogether. Thus, while it is true that FERC, at one point, evades the jurisdictional question by deeming it too "difficult" to resolve, more often than not FERC affirmatively concludes that it in fact does not have jurisdiction over the transmission at issue here. From this survey of FERC's positions, I can only conclude that the Court's singular reliance on the one statement is misguided.

3

Finally, to the extent that FERC has concluded that it *lacks* jurisdiction over transmission connected to bundled re-tail sales, it ignores the clear statutory mandate. By refus-ing to regulate the transmission associated with retail sales in States that have chosen not to unbundle retail sales, FERC has set up a system under which: (a) each State's internal policy decisions concerning whether to require un-bundling controls the nature of federal jurisdiction; (b) a util-ity's voluntary decision to unbundle determines whether FERC has jurisdiction; and (c) utilities that are allowed to

continue bundling may discriminate against other companies attempting to use their transmission lines. The statute neither draws these distinctions nor provides that the jurisdictional lines shift based on actions taken by the States, the public utilities, or FERC itself. While Congress understood that transmission is a necessary component of all energy sales, it granted FERC jurisdiction over all interstate transmission, without qualification. As such, these distinctions belie the statutory text.

## II

As the foregoing demonstrates, I disagree with the deference the Court gives to FERC's decision not to regulate transmission connected to bundled retail sales. Because the statute unambiguously grants FERC jurisdiction over all interstate transmission and § 824e mandates that FERC remedy undue discrimination with respect to all transmission within its jurisdiction, at a minimum the statute required FERC to consider whether there was discrimination in the marketplace warranting application of either the OATT or some other remedy.

I would not, as petitioner Enron requests, compel FERC to apply the OATT to bundled retail transmissions. I would vacate the Court of Appeals' judgment and require FERC on remand to engage in reasoned decisionmaking to determine whether there is undue discrimination with respect to transmission associated with retail bundled sales, and if so, what remedy is appropriate.

For all of these reasons, I respectfully dissent from Part IV of the Court's opinion.