**ENRON POWER MARKETING, INC. and Virginia Electric and Power Company, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

---

Entergy Services, Inc., et
al., Intervenors.

No. 00–1421.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 7, 2001.

Decided July 26, 2002.

Jeffery D. Watkiss argued the cause and filed the briefs for petitioners.

Beth G. Pacella, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was Dennis Lane, Solicitor.

Robert C. Glinski, Thomas C. Doolan and Floyd L. Norton IV were on the brief for intervenors Entergy Services, Inc. and Tennessee Valley Authority. Edward S. James E. Fox entered appearances.

Before: SENTELLE, TATEL and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Petitioners Enron Power Marketing, Inc. and Virginia Electric and Power Company petition for review of a Federal Energy Regulatory Commission ("FERC") order accepting for filing from Entergy Services, Inc., an attachment revising its open access transmission tariff, and a subsequent order denying rehearing. *Entergy Services, Inc.*, 91 F.E.R.C. ¶ 61,151, 2000 WL 641226, *reh'g denied,* 92 F.E.R.C. ¶ 61,108, 2000 WL 1197819 (2000). We deny the petition for review for the reasons that follow.

I. BACKGROUND

In its Order No. 888 series, FERC required that the wholesale transmission function be unbundled from the sale of electric power and required electric utilities to provide open access to their transmission lines in a nondiscriminatory fashion. *Promoting Wholesale Competition Through Open Access Non–Discriminatory Transmission Services by Public Utilities,* Order No. 888, FERC Stats. & Regs.

¶ 31,036, 61 Fed. Reg. 21,540 (May 10, 1996), *clarified,* 76 F.E.R.C.¶ 61,009, 1996 WL 363765, and 76 F.E.R.C. ¶ 61,347, 1996 WL 799257 (1996), *on reh'g,* Order No.888–A, FERC Stats. & Regs. ¶ 31,048, 62 Fed. Reg. 12,274 (Mar. 14, 1997), *clarified,* 79 F.E.R.C. ¶ 61,182, 1997 WL 257595 (1997), *on reh'g,* Order No. 888–B, 81 F.E.R.C. ¶ 61,248, 62 Fed.Reg. 64,688, 1997 WL 833250 (1997), *on reh'g,* Order No. 888–C, 82 F.E.R.C. ¶ 61,046, 1998 WL 18148 (1998), *aff'd, Transmission Access Policy Study Group v. FERC,* 225 F.3d 667 (D.C.Cir.2000), *aff'd sub nom. New York v. FERC,* —— U.S. ——, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002) (hereinafter "Order 888"). To this end, FERC prescribed a pro forma open access transmission tariff ("OATT") and required transmission owners to file tariffs consistent with or superior to the pro forma. The pro forma OATT provides for both network integration transmission service ("NITS") and point-to-point transmission service. FERC also ordered transmission owners and operators to provide timely capacity, reservation, and scheduling information for OATT customers and transmission owners via an open-access same-time information system known by the acronym OASIS.

Entergy Services, Inc. ("ESI") filed such an OATT tariff as agent for five affiliated operating companies: Entergy Arkansas Inc., Entergy Gulf States, Inc., Entergy Louisiana, Inc., Entergy Mississippi, Inc. and Entergy New Orleans, Inc. (collectively with ESI, "Entergy"). On March 21, 2000, ESI filed a proposed new Attachment M to that OATT. In pertinent part, Attachment M provided that

> all transmission customers desiring point-to-point transmission service under Entergy's OATT must submit to Entergy OASIS reservations and transmission schedules that designate specific and valid sources and sinks. For a source and sink located on the Entergy transmission system, Entergy explains

that the source must be a specific generator, and the sink must be a specific load. For a source and sink off the Entergy transmission system, Entergy states that the source can be the control area where the generator unit is located, and the sink can be the control area where the load is located. However, Attachment M specifies that neither a generator, nor a generation-only control area will be accepted as a valid sink. Similarly, loads and load-only control areas will not be accepted as valid sources. In Attachment M, Entergy also outlines the procedures to be used in the event that the source and sink identified on the OASIS reservation is different from the source and sink provided in the transmission schedule. In addition, Entergy proposes to limit the scheduled amount for any point-to-point transmission schedule on Entergy's system to the rated capacity of the generator or the maximum load. Entergy asserts that Attachment M is intended to improve *reliability and congestion management.*

91 F.E.R.C. at 61,563 (emphasis added). The required notice of this filing in the Federal Register drew objections from, among others, petitioners Enron and Virginia Power, who argued that Attachment M was in fact not necessary on reliability grounds and that it discriminated between Entergy and petitioners. FERC rejected all objections and approved Attachment M. *Entergy Services, Inc.,* 91 F.E.R.C. ¶ 61,-151, 2000 WL 641226, *reh'g denied,* 92 F.E.R.C. ¶ 61,108, 2000 WL 1197819 (2000). Enron and Virginia Power petitioned this court to review FERC's decision approving Attachment M under the standards of the Administrative Procedure Act and to set it aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## II. DISCUSSION

The petitioners have raised two issues: the "discrimination" or "comparability" issue and the "reliability-deference" issue. We hold with FERC on each.

### A. *Comparability Issue*

■ The standard by which FERC reviews OATT filings, both original and revised, is whether they are consistent with or superior to the Order 888 pro forma OATT. Order No. 888, FERC Stats. & Regs. at 31,770. The pro forma tariff is set out in Appendix B to Order 888–A at 30,503–543. Order 888 requires transmission owners to provide transmission services to others and for such owners and their affiliates to take transmission on their own facilities on the same terms and conditions as those facilities· are available to others. This requirement of nondiscrimination or comparability is one of the foundations of Order 888.

Petitioners submit that the new requirements of Attachment M violate this principle of comparability. Entergy's Attachment M requires that both a reservation of point-to-point ("PTP") transmission capacity and the follow-on scheduling of that transmission specify both the electrical source from which the transmission· arises and the electrical sink (or destination) into which the transmission will sink or disappear. Control areas, which are electric zones over whose boundaries with other such control areas the flow of electricity is measured and regulated, can be substituted for both sources and sinks, but a control area substituted for a source must have generation capacity and a control area substituted for a sink must have electrical demand located therein, or "native load." Entergy will not accept a reservation or schedule that identifies a generation-only control area as the sink. Because Entergy has both native load and generation capacity within its control areas, this is no limitation on Entergy, and petitioners assert that Entergy does reserve and schedule into and out of its control area.· . However, because Enron and Virginia Power's Batesville, Mississippi, control area is generation only, and is a control-area island in an Entergy sea, Entergy will not accept Batesville as a sink when Enron or Virginia Power attempt to reserve and schedule transmissions on Entergy facilities. Per petitioners, this interferes with their ability to set up hub transactions that pass through Batesville, at least on paper, and other techniques of energy traders in a manner that Entergy, with both generation capacity and customer load native to its control areas, does not suffer.

In FERC's view, however, comparability of an OATT is tested on the basis of terms and conditions offered to customers, not on the usefulness of those terms and conditions to a particular customer because of that customer's capacities and needs. Arguably, this rationale alone may be sufficient to sustain FERC's decision on this point, but in any event, the question under review is whether FERC's interpretation of its own orders survives the arbitrary and capricious standard imposed by the Administrative Procedure Act. FERC's decision easily passes that test. *See, e.g., Sithe/Independence Power Partners v. FERC,* 165 F.3d 944, 948 (D.C.Cir.1999). At base, FERC's decision was that Attachment M is consistent with or superior to the pro forma tariff. It is neither arbitrary nor capricious for FERC to forbid the fictitious designation of a control area as a sink (ultimate user) site when the control area is only a generator. *Cf. Wisconsin Power and Light Co.,* 84 F.E.R.C. ¶ 61,300, 1998 WL 649168 (1998) (disapproval of a generator as a point of receipt in a PTP transmission). Conversely, it is neither arbitrary nor capricious for FERC to conclude that a load-only control area

(one without generating capacity) cannot serve as a source. For Enron to designate sinks as areas without load it would appear that it had not yet sold the power it sought to obtain. That is, if it had a true sink, why did it designate the "fictitious" one?

Petitioners' best attempt at displaying arbitrariness and capriciousness in FERC's decision is to claim that the decision "reverse[s] unreasonably and without explanation two long standing FERC policies: one prohibiting discrimination and instead requiring service comparability in access to the interstate transmission grid, and the other requiring deference in matters pertaining to the reliable operations of that grid to the 'true expert in the field,' NERC." Petitioners' argument fails in its first premise. FERC needed no explanation for any reversal of policy as to discrimination, since it found no discrimination. It is disingenuous of petitioners to claim that FERC did not explain why it was no longer prohibiting discrimination when it had found none as to which any prohibition could be lifted.

Petitioners argue that Attachment M also discriminates in the matter of net scheduling. Net scheduling refers to a practice, with respect to a particular electrical interface, of scheduling for the same time period partially offsetting inbound and outbound transmissions that differ arithmetically by no more than the capacity of the interface. In petitioners' illustration, the Batesville generation only control area has a rated generating capacity of 840 megawatts, and so should be an acceptable scheduling sink for a particular time period for 2,000 megawatts of inflow and, for the same period, an acceptable scheduling source for 2,840 megawatts of outflow because the arithmetical difference does not exceed Batesville's rated 840 megawatt generating capacity, provided the *actual* interchange, when it occurs, does not exceed Batesville's 840 megawatt

generating capacity. Attachment M prohibits this scheduling practice, in effect, by limiting acceptable scheduling transactions by rated capacity—i.e., to the electric reality of power flows that petitioners' own illustration and argument conceded must ultimately be observed. According to petitioners, the discrimination arises because it is "undisputed" that Entergy net schedules for itself. But this "undisputed" discrimination is illusory. FERC's order adequately if briefly addresses this argument. As FERC makes plain, "in its filing, Entergy commits to apply the proposed business practices on a nondiscriminatory basis." Petitioners' assertion that Entergy will discriminatorily allow itself net scheduling while discriminatorily burdening the scheduling of its customers, is no more than an assertion. Petitioners have offered no evidence to impeach FERC's conclusion. FERC's rejection may have been a terse one, but petitioners' proffer required no more. Cf. *Lomak Petroleum, Inc. v. Federal Energy Regulatory Commission*, 206 F.3d 1193, 1198 (D.C.Cir.2000) (petitioner had burden but "failed to establish convincing inconsistencies"). FERC's treatment is adequate given the clarity of FERC's position on "fictitious" reservation and scheduling data. Attachment M applies the scheduling limitations to all, which satisfies comparability, and the petitioners have not shown otherwise.

**B.** *Reliability Deference*

██ Petitioners' second argument is also founded on a flawed premise. Petitioners argue that FERC acted capriciously by failing, without adequate explanation, to follow its allegedly long-standing practice of deferring on matters of reliability to the North American Electric Reliability Council ("NERC"), an industry group formed after the massive power outage in the northeastern United States in 1965 to

facilitate voluntary industry cooperation and standards on reliability issues. This argument is possibly more disingenuous than the first. As to discrimination, the flaw in petitioners' premise was in its assertion that FERC had departed from its policies when it had not had occasion to apply it. As to the argument that FERC improperly departed from its policy of deference to NERC, it had no such policy in the first instance.

In support of their objection that the real-data-only reservation and scheduling requirements of Attachment M were not necessary on reliability grounds, petitioners offered the opinion of an ad hoc Policy Interpretation Task Force ("PITF") of NERC that had addressed a similar dispute between an affiliate of petitioner Enron and the Tennessee Valley Authority ("TVA"). (TVA is not subject to FERC jurisdiction.) The NERC PITF had expressed the view that the hub scheduling and net scheduling practices favored by petitioners were not inappropriate on electric-grid reliability grounds, provided that complete actual flow data was available sufficiently in advance to permit system-reliability analysis. Further, the PITF expressed the view that if the volume of "last minute" data changes and completions overwhelmed analytic capabilities and put system stability at risk, the closing of the timing window should be moved back for everyone on a non-discriminatory basis. It is this opinion to which petitioners assert that FERC owes deference.

This argument is without merit. Petitioners have failed utterly to demonstrate any practice of FERC deference to NERC. We seriously question whether there validly could be such a policy. FERC is a creature of statute and has only those authorities delegated to it by the Congress. Petitioners have offered no support for the proposition that Congress ever has or even could delegate authority to a federal agency which would then be able to essentially redelegate that authority by deferring to a private body associated with the industry which Congress had commissioned it to regulate. FERC may of course consider and accept the expert opinion of NERC on an electric-grid reliability issue in the same manner that any finder of fact or policy maker may consider and accept the views of an expert, but that does not limit its authority to reject or limit reliance upon the same expert in future cases. Moreover, even to the extent that FERC may have a practice of accepting as helpful or useful the opinions of NERC, NERC's reliability opinion does not appear to be fundamentally inconsistent with FERC's acceptance of Attachment M. NERC's reliability opinion is at base a timing issue, and Attachment M simply takes a conservative but non-discriminatory approach as to when it requires complete and real data from everyone. There is no binding practice of deference by FERC to NERC, and nothing relevant to which FERC might defer.

## III. CONCLUSION

FERC reasonably concluded that Entergy's Attachment M is consistent with or superior to FERC's own pro forma open–access transmission tariff, and comparable in the terms and conditions on which point-to-point transmission service is offered to affiliated and unaffiliated customers alike. Its determinations are not undermined by petitioners' arguments regarding the allegedly discriminatory effect of Attachment M's source and sink requirements and capacity limitations, and FERC owed no deference to the opinion offered in an unrelated matter of an ad hoc task force of the

North American Electric Reliability Council. Accordingly, the petition for review is

*Denied.*