TRAXLER, Circuit Judge,
concurring in part and dissenting in part:
I concur in Parts III, IV, and V of the majority opinion (with the exception of footnote 3). However, because I believe that FERC correctly interpreted “withheld approval [of a permit application] for more than 1 year” in 16 U.S.C.A. § 824p(b)(l)(C) (West Supp.2008) to include the failure or refusal to grant a permit application for more than one year in cases in which the permit application was denied, I respectfully dissent from the contrary holding.
I.
A.
Before examining the specific statutory language in question, I pause briefly to discuss the circumstances that brought about the legislation. Most important among these circumstances is the shift, since the enactment of the Federal Power Act, in the way that electricity has been produced and delivered to consumers, from it being generated and consumed in the same general geographic area to it being transmitted great distances from the area in which it was generated.
[U]nlike the local power networks of the past, electricity is now delivered over three major networks, or “grids,” in the continental United States.... It is only in Hawaii and Alaska and on the “Texas Interconnect” — which covers most of that State — that electricity is distributed entirely within a single state. In the rest of the country, any electricity that enters the grid immediately becomes part of a vast pool of energy that is constantly moving in interstate commerce. As a result, it is now possible *321 for power companies to transmit electric energy over long distances at a low cost.
New York v. FERC, 535 U.S. 1, 7-8, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002) (footnote omitted). A study issued in May 2002 by the Department of Energy noted, however, that construction of new transmission facilities has been unable to keep up with increasing demands for electricity, resulting in transmission bottlenecks that have increased consumer costs as well as the chances of blackouts. See U.S. Dep’t of Energy, National Transmission Grid Study (May 2002) (“Study”), at xi, 5-6 available at http://www.ferc.gov/industries/electric/ gen-info/transmissiongrid.pdf. The Study further determined and recommended:
Rules and regulations that will improve procedures for the siting and permitting of transmission lines should be implemented immediately. The FERC should play a limited role focused on supporting state and regional efforts, but should also possess backstop authority to ensure that transmission facilities that eliminate national interest transmission bottlenecks are sited and constructed. The FERC should act if state and regional bodies are unsuccessful in siting and permitting national interest transmission lines.
Study at 58-59. In this regard, Senate Energy and Natural Resource Committee Chairman Domenici stated on the Senate floor concerning pending legislation that eventually would become the Energy Policy Act of 2005 (“EPAct 2005”), Pub.L. No. 109-58, 119 Stat. 594 (2005):
To avoid future blackouts and provide our industry and consumers with the reliable electricity they need, we need to invest in critical transmission infrastructure; provide limited Federal siting authority of transmission lines to ensure the transmission of national interest lines, and avoid the most significant areas where we had gridlock; [and] streamline the permitting of siting for transmission lines to assure adequate transmission.... We need all these parts of the Energy bill.
150 Cong. Rec. S3732 (daily ed. April 5, 2004) (statement of Sen. Domenici). It was in this context that Congress enacted EPAct 2005.
B.
I agree for the reason explained by my colleagues that our review of the statutory language at issue must be guided by Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See ante at 312-13. Under Chevron, we must first determine “whether Congress has directly spoken to the precise question at issue.” Chevron, 467 U.S. at 842, 104 S.Ct. 2778. If so, we need go no further. See id. On the other hand, “if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.” Id. at 843, 104 S.Ct. 2778. We would not need to conclude that the agency’s interpretation is “the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.” Id. at 843 n. 11, 104 S.Ct. 2778. Rather, to uphold the agency’s construction, we need only find that it was “reasonable.” Id. at 844, 104 S.Ct. 2778. In my view, the language of the statute, when considered in the context of the statute’s purpose and other provisions in the statute, is susceptible to only one interpretation, the one that FERC adopted.
Section 824p(b) allows FERC, after notice and an opportunity for hearing, to issue permits for construction or modifica *322 tion of electric transmission facilities in areas the Secretary of Energy has designated as national interest electric transmission corridors if it finds that
(1)(A) a State in which the transmission facilities are to be constructed or modified does not have authority to—
(i) approve the siting of the facilities; or
(ii) consider the interstate benefits expected to be achieved by the proposed construction or modification of transmission facilities in the State;
(B) the applicant for a permit is a transmitting utility under this chapter but does not qualify to apply for a permit or siting approval for the proposed project in a State because the applicant does not serve end-use customers in the State; or
(C) a State commission or other entity that has authority to approve the siting of the facilities has-
(i) withheld approval for more than 1 year after the filing of an application seeking approval pursuant to applicable law or 1 year after the designation of the relevant national interest electric transmission corridor, whichever is later; or
(ii) conditioned its approval in such a manner that the proposed construction or modification will not significantly reduce transmission congestion in interstate commerce or is not economically feasible;
(2) the facilities to be authorized by the permit will be used for the transmission of electric energy in interstate commerce;
(3) the proposed construction or modification is consistent with the public interest;
(4) the proposed construction or modification will significantly reduce transmission congestion in interstate commerce and protects or benefits consumers;
(5) the proposed construction or modification is consistent with sound national energy policy and will enhance energy independence; and
(6) the proposed modification will maximize, to the extent reasonable and economical, the transmission capabilities of existing towers or structures.
16 U.S.C.A. § 824p(b) (emphasis added).
“The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.” Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). We begin with the statutory text. See Tidewater Fin. Co. v. Williams, 498 F.3d 249, 254 (4th Cir.2007). “In the absence of a definition from Congress in a statute, or a clear congressional intent to the contrary, we accord words in a statute their ordinary, contemporary, common meaning.” Worden v. SunTrust Banks, Inc., 549 F.3d 334, 345 (4th Cir.2008) (citation & internal quotation marks omitted). Applying the common meaning of the word “withhold” yields a straightforward rule that a state has “withheld approval for more than 1 year” when one year after approval has been sought, the state still has not granted it, regardless of the reason. See Funk & Wagnalls Standard Dictionary 936 (1980) (defining “withhold” in part as “[t]o keep back; decline to grant”). Indeed, this is the construction that FERC adopted.
Despite the apparent clarity of the words “withhold” and “approval,” Petitioners maintain that even if a state has not granted approval more than a year after an application has been submitted, it has not “withheld approval for more than 1 *323 year” if it has affirmatively denied the application. Petitioners argue that denying approval cannot constitute “withh[old-ing] approval” because a denial is a discrete event and it therefore makes no sense to speak of “denying approval for more than 1 year.”
In my opinion, this argument is not sound. Under FERC’s interpretation, the discrete event of denial does not constitute the withholding of approval that extends for more than one year after the application is received. The denial is merely one event that may occur during the more-than-one-year period in which approval is withheld. Under the common meaning of the words “withhold” and “approval,” approval is withheld, ie., not granted, every day that no decision is issued granting approval, and it continues to be withheld on the day an application is denied (as well as every day that such a denial is not reconsidered). Thus, if a state denies an application, and then, ten months after submission of the application, reverses course and grants the application, it would certainly be the case that the state “withheld approval” for ten months before granting it. Similarly, if one year and one day after submission of an application a state has denied an application (and not reconsidered its decision), it has “withheld approval for more than 1 year.” There is no other reasonable way to interpret those words.[1]
Not surprisingly, an examination of the context in which these words are used and the context of the statute as a whole confirms that Congress meant its words to be given their common meaning. First and foremost is the subsection directly following 16 U.S.C.A. § 824p(b)(l)(C)(i), which gives FERC authority when a state has granted approval but “conditioned its approval in such a manner that the proposed construction or modification will not significantly reduce transmission congestion in interstate commerce or is not economically feasible.” 16 U.S.C.A. § 824p(b)(l)(C)(ii). Read together, the two subsections provide that while a state has a full year to consider and act on an application without interference from FERC, FERC nevertheless has the authority to ensure that a state does not frustrate the goal of significantly reducing transmission congestion in a national interest corridor. Petitioners, however, suggest that Congress did not intend to essentially “trump” the states’ permitting decisions in order to accomplish this goal. That suggestion is completely belied, however, by Congress’s undisputed willingness to do just that when a state grants a permit under conditions FERC determines to be unreasonable. See 16 U.S.C.A. § 824p(b)(1)(C)(ii). The notion that Congress would have been willing to *324 “trump” states when they thwart the goal of significantly reducing transmission congestion in a national interest corridor by granting permits subject to conditions FERC determines to be unreasonable but would not be willing to do so when states thwart the same goal by denying the permits outright makes no sense to me in light of the purpose of the legislation.
The argument that Petitioners’ interpretation can be squared with § 824p(b)(l)(C)(ii) because “[w]hen a state commission grants approval with project-killing conditions, it misuses its authority, and the state licensing system has failed,” but when a state simply denies an application, it “acts with transparency and engages in a legitimate use of its traditional powers,” ante at 314-15, is not correct in my view. With all due respect, such a misuse of authority would occur only if a state granted its approval with conditions that it imposed for the purpose of killing the project. Section 824p(b)(l)(C)(ii) is not so narrow as to limit FERC’s jurisdiction to cases in which such intentionally deceptive action has occurred. Rather, it clearly allows FERC to exercise jurisdiction based on simple differences of opinion between FERC and the state regarding the impact of the conditions imposed.[2]
Nor can I square 16 U.S.C.A. § 824p(i) (West Supp.2008) with Petitioners’ suggestion that Congress intended to allow a single state to impede Congress’s goal of reducing transmission congestion in national interest electric transmission corridors by simply denying an application outright. That subsection allows three or more contiguous states to enter into an interstate compact, subject to Congress’s approval. States that have entered into such compacts are authorized to establish regional transmission siting agencies that can facilitate siting of electric transmission facilities within those states and carry out their siting responsibilities. FERC has no authority to issue permits for construction or modification of electric transmission facilities within such states so long as all states in the compact agree that the permit should not be issued. See 16 U.S.C.A. § 824p(i)(4). Had Congress been inclined to allow a single state to simply veto a transmission facility for purely local reasons — as it could do under Petitioners’ construction — there would have been no reason to provide for these interstate compacts or to provide that states in such compacts must unanimously oppose the grant of an application to deprive FERC of authority.
I recognize that several states participating in this appeal as amici curiae contend that FERC’s interpretation would render the states’ consideration of applications irrelevant. Even if the contention were true, it would not create an ambiguity in the statute, especially considering the critical national energy interests that Congress sought to protect with this legislation. FERC brings a broader national perspective to siting proposals in national interest electric transmission corridors than individual states possess, and Congress clearly intended that FERC would be authorized to act from that perspective. Nevertheless, the contention that FERC’s interpretation makes the states’ permitting decisions irrelevant is not correct. FERC has explained that it takes into consideration a state’s decision in making its own permitting determinations. Furthermore, a state has the authority to impose on any *325 grant of an application conditions that FERC is powerless to overturn so long as the conditions are economically feasible and would not prevent the significant reduction of transmission congestion in interstate commerce. See 16 U.S.C.A. § 824p(b)(l)(C)(ii). By considering the states’ decisions and allowing states to impose reasonable conditions upon application grants, FERC can pursue important national energy interests while at the same time respecting, to some degree, the interests and judgments of the states. Thus, FERC’s interpretation is strongly supported by the framework of the statutory scheme as a whole.
C.
Although it is not determinative, it is nonetheless worth noting that FERC’s construction, which I believe to be the only plausible reading of the statute, is also buttressed by the applicable legislative history. The plainest statements from the House of Representatives are from the House Committee Report on bill H.R. 1640, which contained language identical to the bill the President eventually signed, H.R. 6. The House Report described the bill as allowing FERC authority “if, after one year, a state, or other approval authority is unable or refuses to site the line.” H.R.Rep. No. 109-215(1), at 261 (2005). Indeed, the House Report also contains “Dissenting Views” of members who understood the bill to have the very same meaning. See id. at 494 (noting that bill would “preempt ... state decisions about whether new or expanded lines should be built”). At least two congressmen, in discussing the merits of the siting provisions of the bill, recognized the clear import of the language. Representative Dingel stated that it “eliminates ... deference to the States in decisions about the siting of electric transmission lines and natural gas facilities,” 151 Cong. Rec. H2193 (daily ed. Apr. 20, 2005), and Representative Shays noted that the bill allows FERC “to preempt state siting authorities when it is determined that a high-voltage power line is of ‘national significance,’ ” id. at H2196. Similarly, a Senate committee report summarizing a bill, S. 10, that contained relevant language identical to that of § 824p(b)(l)(C)(i), described the bill as “authoriz[ing] FERC to issue siting permits if a State withholds approval in appropriately.” S.Rep. No. 109-78, at 5 (2005) (emphasis added). The use of the term “inappropriately” strongly suggests that the Committee primarily had in mind situations in which a state denied a permit that was necessary to ensure reliability of the national transmission grid, not simply situations where a state had not ruled on an application for a certain period of time.
Petitioners maintain that FERC’s authority in the legislative history is often described as “limited” or “backstop,” which they believe indicates that FERC lacks authority when a state denies a permit outright. But that is simply not the case. This characterization merely recognizes what I have already explained — that Congress sought to achieve a balance in giving the states an opportunity to dispose of permit applications without involvement by FERC, by allowing the states to place reasonable conditions on the grant of such permits that could not be overruled, and by allowing them to form compacts of three or more contiguous states whose unanimous denials also could not be overridden. That FERC’s authority may be limited does not even suggest that Congress would not have authority to grant applications in some situations in which states had denied them. See Study, at 59 (“The FERC should play a limited role focused on supporting state and regional efforts, but should also possess backstop authority to ensure that transmission facilities that eliminate national interest transmission bottlenecks are sited and constructed. The FERC should act if *326 state and regional bodies are unsuccessful in siting and permitting national interest transmission lines”) (emphasis added).
II.
In sum, the reasons are numerous for concluding that § 824p(b)(l)(C)(i) plainly has the meaning that FERC adopted. Only FERC’s interpretation gives Congress’s words their common meaning, and only FERC’s interpretation makes sense in the context in which the language is used and in the context of the statute as a whole. Indeed, as I have explained, that plain meaning is also the one indicated in the applicable legislative history. Finally, even assuming arguendo that the statute’s meaning were not plain, I would conclude that FERC’s interpretation was reasonable at the very least, and therefore entitled to deference under Chevron. I would therefore affirm FERC’s interpretation.[3]

. Petitioners contend that had Congress intended that a state could have "withheld approval for more than 1 year” in a case in which the application was denied during the one-year period, it could have conveyed that notion more clearly had it substituted "denied an application or failed to act for more than one year,” for “withheld approval.” Petitioners note that Congress actually employed such language in another part of the statute, see 16 U.S.C.A. § 824p(h)(6)(A) (West Supp.2008) ("If any agency has denied a Federal authorization required for a transmission facility, or has failed to act by the deadline established ...”), and Petitioners suggest that its decision not to do so here creates some doubt as to what Congress intended. Petitioners’ point might have some force if the language Congress did choose were reasonably susceptible to more than one meaning, but it is not, as I have explained. Moreover, had Congress simply meant "failed to act on an application for more than 1 year,” and not meant the statute to include outright denials, it could easily have used words that actually had that meaning, as it did in another part of EPAct 2005. See 16 U.S.C.A. § 824b(a)(5) (West Supp.2008) ("If the Commission does not act within 180 days [on an application] ...").

. For the same reason, in my view, the conclusion that the four circumstances other than § 824p(b)(l)(C)(i) "allow FERC jurisdiction only when a state commission either is unable to act or acts inappropriately,” ante at 314 (emphasis added), is not correct with respect to § 824p(b)(l)(C)(ii) if "inappropriately” refers to a misuse of authority.

. Because I would affirm FERC's construction, I would need to address the claim of Petitioner Communities Against Regional Interconnect that FERC was required to prepare an environmental assessment ("EA”) or an environmental impact statement ("EIS”) when it adopted its interpretation. I would hold that FERC's decision not to prepare an EA or an EIS was reasonable. See Sugarloaf Citizens Ass’n v. FERC, 959 F.2d 508, 512 (4th Cir.1992) (stating standard of review).