Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 10, 2009       Decided April 16, 2010

No. 09-1060

FLORIDA MUNICIPAL POWER AGENCY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

FLORIDA POWER & LIGHT COMPANY,
INTERVENOR

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Robert A. Jablon* argued the cause for petitioner. With him on the briefs were *Daniel I. Davidson*, *Peter J. Hopkins*, and *Rebecca J. Baldwin*.

*Holly E. Cafer*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the

brief were *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Clifford (Mike) Naeve* argued the cause for intervenor. With him on the brief were *Kathryn Kavanagh Baran* and *Stephen L. Huntoon*.

Before: ROGERS and GRIFFITH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The Florida Municipal Power Agency ("Florida Municipal") petitions for review of two orders of the Federal Energy Regulatory Commission ("FERC") regarding the rate base for network transmission service using the facilities of Florida Power & Light Company ("Florida Power"). Florida Municipal resists the conclusion that the comparability principle, under which FERC applies the same integration standard to Florida Municipal and Florida Power in determining whether their facilities provide any benefit to Florida Power's transmission system, bars the relief Florida Municipal seeks. In regard to FERC's approval of Florida Power's April 2005 compliance filing, Florida Municipal first challenges the sufficiency of the evidence supporting the finding that the test Florida Power used in 2005 on its facilities to identify "unneeded redundancy" was comparable to the test Florida Power used in 1994 to evaluate Florida Municipal's Vero Beach–to–Fort Pierce facilities. Second, Florida Municipal contends its facilities were required to be treated no differently than Florida Power's local facilities, so that Florida Power's rate base must exclude the costs associated with Florida Power's local facilities. We deny the petition.

3

## I.

The background to these proceedings appears in *Florida Municipal Power Agency v. FERC*, 411 F.3d 287, 288–91 (D.C. Cir. 2005) ("*Florida Municipal II*"). Florida Municipal obtained access to Florida Power's network transmission system but did not receive pricing credits for using its own transmission facilities if they were "interconnected" rather than "integrated" with Florida Power's transmission system. *See Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 364–68 (D.C. Cir. 2003) ("*Florida Municipal I*").[1]  In denying credits, FERC explained that it had "not direct[ed] a merging of the parties' transmission systems or the operation of a joint transmission network." *Fla. Mun. Power Agency v. Fla. Power & Light Co.*, 74 FERC ¶ 61,006, 61,009 (1996) ("*FMPA II*").  In affirming that denial, the court described FERC's pricing system as allocating the price of network transmission services based on the ratio of each network customer's load to the total load on the transmission system. *Fla. Mun. I*, 315 F.3d at 363.  In addition, the court described FERC's "principle of 'comparability,'" in which "the same integration standard that applies to transmission customers

---

[1] *See also Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. & Transmitting Utils.*, 61 Fed. Reg. 21,540, 21,630 (May 10, 1996) ("Order No. 888"), *on reh'g*, 62 Fed. Reg. 12,274, 12,330 (Mar. 14, 1997) ("Order No. 888-A"), *on reh'g*, 62 Fed. Reg. 64,688 (Dec. 9, 1997), *on reh'g*, 82 FERC ¶ 61,046 (Jan. 20, 1998), *aff'd*, *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002); *Fla. Mun. Power Agency v. Fla. Power & Light Co.*, 67 FERC ¶ 61,167, at 61,477-78, 61,481 (May 11, 1994) ("*FMPA I*"), *reh'g granted in part*, 74 FERC ¶ 61,006 (Jan. 5, 1996) ("*FMPA II*"), *reh'g denied*, 96 FERC ¶ 61,130 (July 26, 2001) ("*FMPA III*"), *aff'd sub nom. Fla. Mun. Power Agency v. FERC*, 315 F.3d 362 (D.C. Cir. 2003) ("*Florida Municipal I*").

for the purpose of determining eligibility for pricing credits[,] also applies to transmission providers for rate determination purposes." *Id.* at 364.

On January 25, 2005, FERC agreed with Florida Power that to be considered "integrated" into its transmission system, a facility would need to pass a four-factor test, with one factor being "a facility that provides only unneeded redundancy is not eligible for cost recovery." *Fla. Power & Light Co.*, 110 FERC ¶ 61,058 at P 13 (2005) ("*January 2005 Order*"). FERC determined Florida Power had not applied this factor to its facilities in the same way it applied the factor to Florida Municipal's facilities, and Florida Power needed to show that "each facility included in its transmission rate base was needed to deliver power to customers in the area where the facility is located *and* to other [Florida Power] load centers." *Id.* (emphasis added).

In April 2005, Florida Power submitted a compliance filing proposing to remove approximately $29 million in costs from its network transmission service rate. FERC concluded it was unclear whether Florida Power had failed to test its non-radial (i.e., looped) facilities in a manner comparable to the way it tested Florida Municipal's facilities. *See Fla. Power & Light Co.*, 113 FERC ¶ 61,263 at P 20 (2005) ("*December 2005 Order*"). Specifically, Florida Power had not indicated whether "unserved load" resulting from tests of its facilities referred to "load that is directly connected to or supplied by" the facility being tested "*and/or* load in other [Florida Power] load centers." *Id.* at P 23. So FERC accepted Florida Power's compliance filing in part but stated that the test Florida Power had applied to its facilities should have been whether, even without the facility being tested, Florida Power is able to deliver power to its customers in the facility's area "*and* to other [Florida Power] load centers." *Id.* at P 21. Florida Power requested rehearing on

the ground that through this use of the word "and" FERC had shifted the comparability standard from that previously used in evaluating the 1994 tests of Florida Municipal's facilities' eligibility for pricing credits. FERC denied the request as untimely. *See Fla. Power & Light Co.*, 116 FERC ¶ 61,013 at P 17 (2006) ("*July 2006 Order*"). Florida Power sought rehearing and reconsideration.

By order of February 21, 2008, FERC reconsidered its denial of rehearing. *Fla. Power & Light Co.*, 122 FERC ¶ 61,159 (2008) ("*2008 Recons. Order*"). FERC acknowledged that it had "erred" in its interpretation of the 1994 test applied to Florida Municipal's Vero Beach–to–Fort Pierce facilities, and concluded that the test Florida Power applied to its facilities to determine whether they provide "unneeded redundancies" was comparable to the 1994 test. *Id.* at P 9–10. In support of this change in position, FERC relied on the affidavits of two experts, Karabet Adjemian and Hector Sanchez, submitted by Florida Power. FERC accepted Florida Power's April 2005 compliance filing. One Commissioner dissented on the ground the majority had not adequately explained its reversal of previous findings on comparability and Florida Municipal had raised "serious concerns" about the speculativeness of the Adjemian and Sanchez affidavits. *2008 Recons. Order*, Dissenting Statement 2–3.

FERC denied Florida Municipal's request for rehearing, reiterating that in its January and December 2005 Orders it had "misinterpreted" Adjemian's 1994 affidavit and thus misstated the test for integration. *Fla. Power & Light Co.*, 125 FERC ¶ 61,344 at P 7, P 20 (2008) ("*2008 Order Den. Reh'g*"). FERC affirmed its determination that the Florida Municipal facilities were "unneeded" because they were not necessary to serve either Florida Power's local or remote load, and that Florida Power's similarly "unneeded" facilities were properly

eliminated from its transmission rate base. *Id.* at P 21. Weighing the evidence, FERC concluded Sanchez's affidavit describing his testing of Florida Power's facilities in 2005 showed he used models and methodologies consistent with Adjemian's 1994 testing of Florida Municipal's facilities. In contrast, Florida Municipal's expert evidence purporting to recreate the 1994 test was unpersuasive because it failed to follow the methodology employed in Adjemian's 1994 test. Ruling that Florida Municipal's objections to the adequacy of Adjemian's 1994 affidavit were brought too late, because FERC had relied on it in the *January 2005 Order*, FERC also rejected Florida Municipal's suggestion that an adverse inference should be drawn from Florida Power's failure to produce a copy of the 1994 test, observing that Florida Power had produced substantial evidence supporting its position "from a record that stretches back to 1994." *2008 Order Den. Reh'g* at P 32. One Commissioner dissented on the ground that the record evidence did not justify the *2008 Reconsideration Order*.

Florida Municipal petitions for review of the *2008 Reconsideration Order* and the *2008 Order Denying Rehearing*. The court "review[s] FERC's orders under the arbitrary and capricious standard and uphold[s] [FERC]'s factual findings if supported by substantial evidence" in the record. *Fla. Mun. II*, 411 F.3d at 291; 5 U.S.C. § 706(2)(A).

**II.**

Florida Municipal contends the challenged orders are not supported by substantial evidence and violate the principle of comparability between transmission provider–owned transmission and transmission customer–owned transmission. As to the former, Florida Municipal objects to FERC's revised interpretation of Florida Power's expert evidence on its test of Florida Municipal's facilities in 1994. It notes that Adjemian,

who conducted the 1994 test, does not remember how the test was done and produced no documentation of the test, and that Sanchez, who conducted the 2005 test, was not sure which testing model and method Adjemian used in 1994. It asserts Adjemian and Sanchez provided conflicting affidavits on the comparability of the 1994 and 2005 tests. For instance, Adjemian's 1994 affidavit at 54 referred to testing whether Florida Power could deliver power "even without [Florida Municipal's] line," while Sanchez's 2005 affidavit at 7 referred to testing "each [Florida Power] transmission facility" and described Adjemian as having "removed the Fort Pierce–Vero Beach line." Florida Municipal maintains the evidence of the comparability of the 1994 and 2005 tests is therefore speculative and conjectural.

"[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970). Where FERC "carefully explained its reasoning . . . . [t]he fact that FERC changed its approach required no additional or special explanation." *Westar Energy, Inc. v. FERC*, 568 F.3d 985, 989 (D.C. Cir. 2009). To provide a reasoned analysis, FERC must first establish that its finding of testing comparability is supported by substantial evidence in the record. We conclude it has.

First, Adjemian's 1994 affidavit stated that Florida Municipal's Vero Beach–to–Fort Pierce electric facilities are interconnected with the Florida Power system and with each other but that, other than the Florida Municipal line connecting Vero Beach and Fort Pierce, the Florida Municipal facilities internal to each city deliver power to or from Florida Power (and where applicable from local generation). From Florida Power's perspective, he explained, Florida Municipal's Vero

Beach–to–Fort Pierce line does not change the fact that Vero Beach and Fort Pierce each interconnect directly at Florida Power delivery points and that internal city facilities do not reduce Florida Power's costs in providing transmission service. Observing that even if one could assume Florida Municipal's facilities and Florida Power's transmission system are part of an integrated transmission grid, the question would remain whether Florida Municipal's facilities in any way benefit Florida Power, i.e., reduce Florida Power's costs. To answer this question, Adjemian stated he applied two tests: (1) whether the Florida Municipal facilities reduce Florida Power's costs in providing transmission to Florida Municipal's cities, and (2) whether the cities' facilities reduce Florida Power's costs in serving Florida Power's other customers. Adjemian concluded "[t]he answer to *both* questions is 'no.'" 1994 Adjemian Aff. 53 (emphasis added). He further explained that although "a negligible amount of power can flow over the [Vero Beach–to–Fort Pierce] line," this fact is not "determinative of whether the line benefits [Florida Power]" because "[t]he question is whether [Florida Power] has sufficient transmission facilities in the area such that, even without the line, [Florida Power] is able to deliver power to retail customers in that area and to transmit power to [Florida Power]'s other load centers in South Florida." *Id.* at 54. FERC had previously focused on this sentence but failed to read it in the context of Adjemian's "No" answers to both questions about whether the Florida Municipal facilities benefit Florida Power.

Second, Adjemian additionally explained that for cities interconnected to Florida Power's system at a single point, the facilities Florida Power needed to transmit power to and from each city do not depend on each city's internal facilities. For cities like Vero Beach and Fort Pierce that are connected by their own power line (i.e., a loop), he had tested Florida Power's system with and without the line and found that the line did not benefit Florida Power because it did not allow Florida Power to

defer or cancel facilities included in its current ten-year transmission expansion plan. "Indeed," Adjemian opined, "Florida Power would have not built this line to provide reliable service to Vero Beach and/or Fort Pierce." *Id.* at 54. Adjemian's 2005 affidavit was to the same effect, repeating that because Florida Power could meet all of its service obligations without Florida Municipal's Fort Pierce–Vero Beach line, the line "provided no benefit to the [Florida Power] transmission system." 2005 Adjemian Aff. 3.

Third, Sanchez's 2005 affidavit described how his 2005 test of Florida Power's facilities applied the same model and methodology that Adjemian had used to test Florida Municipal's facilities in 1994. Reading the *January 2005 Order* that Florida Power apply to its facilities "the system modeled by [Florida Power] to analyze the integration of [Florida Municipal]'s Fort Pierce–Vero Beach line," *January 2005 Order* at P 12, to refer to Adjemian's 1994 testing, Sanchez stated he believed Adjemian had used a load flow model compiled by the Florida Electric Power Coordinating Group ("FCG") to analyze whether Florida Municipal was entitled to credits for the costs of the Fort Pierce–Vero Beach line. He explained this "load flow model provides a snapshot of the system at the time of peak load, and consists of data that includes the Florida companies' respective forecasted loads, generation, expansion plans, and long-term firm wholesale obligations." 2005 Sanchez Aff. 3. Sanchez gave three reasons for his "belie[f] Mr. Adjemian used the 1994 vintage FCG load flow model to analyze the Fort Pierce–Vero Beach line." *Id.* First, that model was officially made available in May or June 1994 and was thus the most recent model available to Adjemian when he conducted the 1994 test. Second, Adjemian had explained that the Fort Pierce–Vero Beach line had been a 69 kV line and was not included in the FCG model until the line was upgraded to 138 kV. *See* 1994 Adjemian Aff. 51. Third, "Florida Power's records indicate that the 138 kV line was

not placed into service until 1994; therefore, a model year of 1994 would need to have been used to test that line." 2005 Sanchez Aff. 4. Sanchez concluded it was reasonable to use the 1994 FCG model to test the Florida Power system in 2005: The 2005 test was consistent with the methodology Florida Power used in 1994 to test Florida Municipal's Fort Pierce–Vero Beach 138kV line because, like Adjemian removing that line from the model, *see* Adjemian Aff. 54–55, he (Sanchez) removed from the model the transmission facility being tested and determined whether simulating a first contingency (a sudden loss of a transmission line, transformer, or generator) resulted in a violation of the model's reliability criteria, i.e., whether, without that line or facility, Florida Power would be able to meet its wholesale transmission and retail obligations.

From this evidence, FERC could reasonably conclude that Florida Power comparably tested Florida Municipal's facilities in 1994 and its own in 2005 to determine whether the tested facilities were necessary for Florida Power to be able to serve either its remote *or* local loads, not both. Substantial evidence in the record "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. I*, 315 F.3d at 365–66 (quotation marks omitted). It is true that Adjemian stated in his 1994 affidavit that he had examined "whether [Florida Power] had sufficient transmission facilities in the area such that, even without the [Florida Municipal] line, [Florida Power] is able to deliver power to retail customers in that area *and* to transmit power to [Florida Power]'s other load centers in South Florida." *2008 Recons. Order* at P 12 (quoting Adjemian 1994 Aff. 54) (emphasis in *2008 Recons. Order*). But he also stated he answered "No" to *both* of the questions he posed in his redundancy analysis. Read together, his statements are consistent with use of an "or" test in 1994. Further, Adjemian's and Sanchez's 2005 affidavits clarified the salient point: could

Florida Power serve its customers without relying on Florida Municipal's facilities.

FERC explained upon reconsideration that it now recognized Adjemian's 1994 affidavit did not "signal that [Florida Power] had used a two-step threshold for integration," but rather that Adjemian "focused on whether [Florida Power]'s facilities could serve *all* loads absent [Florida Municipal]'s Vero Beach–to–Fort Pierce facilities." *2008 Recons. Order* at P 13. That is, the 1994 test examined whether removing facilities during the test "curtails either local or remote load, not whether it curtails both." *Id.* FERC also relied on Sanchez's affidavit, finding the tests he and Adjemian performed "considered the threshold question, whether a given facility provided *any* benefit to [Florida Power]'s system." *Id.* at P 14 (citing Sanchez 2005 Aff. 5–7, Adjemian 2005 Aff. 3).

Contrary to Florida Municipal's contention on appeal, the record evidence permitted FERC reasonably to conclude that Florida Power's evidence was neither speculative nor conjectural. It is true that Adjemian did not recall precisely which test he had used in 1994, but as FERC observed, Adjemian conducted the test and "thus was in the best position to describe the test." *2008 Order Den. Reh'g* at P 29. FERC found his 2005 affidavit confirming the 1994 test methodology credible because it was consistent with his 1994 affidavit. Adjemian's affidavit, regarding the two cost reduction questions he addressed, that "[t]he answer to *both* questions is 'no,'" 1994 Adjemian Aff. 53 (emphasis added), was properly understood, FERC now recognized, to mean that Florida Municipal's facilities were not necessary for Florida Power to serve any load, either remote or local. This interpretation of the 1994 test is supported by Adjemian's 2005 affidavit, by Sanchez's 2005 affidavit describing the 1994 model and why Adjemian logically would have used it, and by the focus of both the 1994 and 2005 tests on

determining any benefit to Florida Power in terms of reducing its costs, namely whether Florida Power could provide reliable wholesale and retail service without the tested facility.

Because there was substantial record evidence to support FERC's finding that the 1994 and 2005 tests were comparable, Florida Municipal's assertion of a conflict between Adjemian's and Sanchez's affidavits misses the mark. Merely pointing to some contradictory evidence is insufficient because "[t]he question [the court] must answer . . . is not whether record evidence supports [Florida Municipal]'s version of events, but whether it supports FERC's." *Fla. Mun. I*, 315 F.3d at 368. And where, as here, FERC decides "between 'disputing expert witnesses,'" as Florida Municipal presented its own expert, the court applies a "particularly deferential standard" of review. *Id.* (quoting *Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738, 746 (D.C. Cir. 2001)). The fact that Florida Power did not produce additional documentation of the 1994 test does not, as Florida Municipal suggests and FERC rejected on rehearing, require an adverse inference against Florida Power. *See, e.g.*, *Ala. Power Co. v. Fed. Power Comm'n*, 511 F.2d 383, 391 & n.14 (D.C. Cir. 1974); *Int'l Union, UAW v. NLRB*, 459 F.2d 1329, 1339, 1346 (D.C. Cir. 1972). Adjemian explained in his 2005 affidavit that no hard copy or electronic files were available for the 1994 tests because the results were only blank screens indicating that the tested Florida Municipal facilities did not benefit Florida Power. Florida Municipal's reliance on *Shepherd v. American Broadcasting Cos.*, 62 F.3d 1469 (D.C. Cir. 1995), is misplaced, because the court there explained that the inference applies only when a party "consciously disregarded its obligation" to preserve documentation, *id.* at 1481, and Florida Municipal offers no such evidence.

Florida Municipal maintains that Florida Power's 2005 test of its transmission facilities was incapable of measuring whether

those facilities were necessary to serve remote, rather than local, customers. Pointing to an affidavit of Joseph Linxwiler in its October 2006 protest of Florida Power's September 2006 compliance filing (responding to the *July 2006 Order*), Florida Municipal describes Florida Power's testing of its lines as a test of line segments, in which, by definition, adjacent segments would be necessary to deliver power to each other unless a segment had an independent power source. But FERC explained that Linxwiler had incorrectly focused on how Florida Power should have performed an "*and*" test on its facilities in 2005 (to test whether a "facility's absence curtained both local *and* remote loads," *2008 Order Den. Reh'g* at P 23), when FERC had determined that in 1994 Florida Power had instead performed an "*or*" test on Florida Municipal's facilities (to test whether a "facility's absence curtailed either local load *or* remote load," *2008 Order Den. Reh'g* at P 23). *2008 Order Den. Reh'g* at P 35. In this situation, FERC observed, what is relevant is not whether segments or lines were tested, but instead that "both Florida Power's and Florida Municipal's facilities were comparably tested by eliminating loop flow." *Id.*

To the extent Florida Municipal maintains FERC has not justified its change in position to allow transmission that benefits only a local area to be included in a rate base, FERC explained in the challenged orders both the nature of its error and the evidentiary basis for its revised interpretation of Adjemian's 1994 affidavit. Combined with the fact that the "*or*" standard was the standard FERC had been applying in these proceedings, as Florida Power pointed out in seeking rehearing of the *December 2005 Order*, FERC's explanation was sufficient. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

**III.**

Florida Municipal also contends, even if the 1994 and 2005 tests were comparable, that FERC nonetheless violated the comparability principle in view of the requirement of the Federal Power Act that rates or charges for electric energy transmission or sale be just and reasonable and not unduly preferential or discriminatory, *see* 16 U.S.C. §§ 824d–824e. Florida Municipal objects to paying rates based on costs of Florida Power facilities that transmit power only to its local customers when Florida Municipal does not receive rate credits for its facilities that transmit power only to its local customers. Florida Municipal views its transmission facilities as "functionally" equivalent to those of Florida Power and thus deserving of comparable treatment. Pet'r Br. 42.

Comparability as defined by FERC is not a test of functional equivalence, but instead a test of whether a facility benefits the transmission provider's network transmission system. *See Fla. Mun. I*, 315 F.3d at 366–67. As FERC has stated, comparability requires only that Florida Power exclude from its rate base or provide credits for those facilities not needed by Florida Power to provide transmission service to its customers, whether those customers are served by local load or remote load. *2008 Order Den. Reh'g* at P 24. Florida Municipal's claim that it must receive credits or rate base reductions for its local facilities thus appears to reflect "a fundamental misunderstanding," Resp't Br. 35, of the 1994 and 2005 tests and Florida Power's status as the network transmission provider.

In *Florida Municipal I*, 315 F.3d at 364, the court quoted Order No. 888, 61 Fed. Reg. at 21,603 (emphasis in original): "The fact that a transmission customer's facilities may be *interconnected* with a transmission provider's system does not prove that the two systems comprise an *integrated* whole such

that the transmission provider is able to provide transmission service to itself or other transmission customers over those facilities—a key requirement of integration." FERC has been applying this integration standard here. *See, e.g.*, *FMPA III*, *supra* note 1, at 61,545. Thus comparability required that "if a transmission provider includes a facility in its rate base, then its transmission customers may receive rate credits for any similarly situated facilities." *Fla. Mun. I*, 315 F.3d at 364. Florida Municipal incorrectly interprets "similarly situated" as "equivalent" without taking into account whether a facility is "integrated" into the provider's transmission network. FERC's distinction between network transmission providers and customers allows Florida Power to include in its rate base its facilities that are needed to serve its customers, but does not allow Florida Municipal to receive credit for facilities it needs (and Florida Power does not need) to serve Florida Municipal's customers. *Cf. Fla. Mun. I*, 315 F.3d at 367–68.

Florida Municipal's claim of undue discrimination fails in view of the substantial record evidence that Florida Power applied comparable tests to both its facilities in 2005 and Florida Municipal's facilities in 1994. The 1994 test examined whether Florida Municipal's facilities are useful to Florida Power to serve Florida Power's customers (including Florida Municipal), not whether Florida Municipal's facilities are useful to Florida Municipal to serve its customers. The 1994 test of Florida Municipal's facilities was comparable to the 2005 test of Florida Power's facilities because both were integration tests to determine whether a facility provided a benefit to the transmission provider, Florida Power. A reduction to Florida Power's rate base would be required only if a Florida Power facility provides "unneeded redundancy" rather than a benefit to Florida Power; because Florida Power's April 2005 compliance filing met FERC's criteria by removing from its rate base those facilities that did not serve either remote or local load for Florida

Power, *see December 2005 Order* at P 6; *2008 Order Den. Reh'g* at P 24, nothing more was required.

To the extent Florida Municipal maintains Florida Power's rate, based on the 1994 and 2005 tests, is not just and reasonable because Florida Power's facilities that serve its local loads are not used in providing service to Florida Municipal, Florida Municipal is collaterally attacking the FERC orders affirmed in *Florida Municipal I*, 315 F.3d 362, as well as Order No. 888 affirmed by this court in *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2002), and by the Supreme Court in *New York v. FERC*, 535 U.S. 1 (2002).

Neither can Florida Municipal show that FERC improperly rejected evidence that Florida Municipal's facilities qualify for pricing credits. Florida Municipal points to evidence that its expert, Robert Williams, tested its Fort Pierce–Vero Beach facilities using Florida Power's 2005 test and determined that these facilities provide more than "unneeded redundancy" and thus should qualify for pricing credits denied in *Florida Municipal I*, 315 F.3d 362. This proceeding is not an opportunity for Florida Municipal to relitigate the eligibility of facilities for pricing credits; that issue was settled by FERC and its denial of pricing credits was affirmed by this court in *Florida Municipal I*. Furthermore, FERC explained why it was unpersuaded Williams's test resembled Adjemian's 1994 test. Adjemian's 1994 test used a "single contingency" test while Williams's test used a "multiple-contingency scenario." FERC concluded the latter required an "unreasonable" assumption that Florida Power would deliver more than the peak load for which it is responsible. How Florida Municipal's "single line contingencies" testing was comparable to the 1994 test was not explained. *2008 Order Den. Reh'g* at P 34. Although Florida Municipal now claims FERC's understanding of the Williams test "makes no sense," Petr.'s Br. 32, Florida Municipal does not dispute the absence of an

explanation before FERC of how Williams's use of "single line contingencies" was comparable to Florida Power's tests. Having found significant deviations between Adjemian's description of his 1994 test, *see 2008 Recons. Order* at n.24, and Williams's description of his test, *see 2008 Order Den. Reh'g* at P 33, FERC reasonably rejected the Williams test evidence because it applied a model and method that were "different (and stricter) than the tests conducted by Florida Power," *id.* at P 34. And while Florida Municipal questions why Florida Power did not retest the Fort Pierce–Vero Beach line in 2005, Florida Power's expert stated he performed the tests of Florida Municipal's facilities that Adjemian had performed in 1994 and the tests again showed that Florida Municipal's facilities provided only unneeded redundancy for Florida Power. *See* 2005 Sanchez Aff. 2–5. FERC's reasoned explanation and weighing of the evidence, particularly between disputing expert witnesses, is entitled to deference. *Fla. Mun. I*, 315 F.3d at 368.

Accordingly, we deny the petition.